641 P.2d 251

**GLOBE AMERICAN CASUALTY COMPANY, a corporation,
Plaintiff-Appellee,**

v.

**Denny LYONS, Earsel Hall and Laura L. Lemon, Defendants-Appellants.**

No. 1 CA–CIV 5168.

Court of Appeals of Arizona,
Division 1, Department A.

Dec. 22, 1981.

Rehearing Denied Jan. 18, 1982.

Petition Denied Feb. 2, 1982.

Monbleau, Vermeire & Turley, P. C. by Kent E. Turley, Phoenix, for plaintiff-appellee.

Robinson & Syme by James J. Syme, Jr., Glendale, for defendants-appellants.

## OPINION

OGG, Judge.

This appeal involves the applicability of an insurance contract provision excluding coverage for "intentional" acts of its insured. We are asked to determine the requisite mental capacity necessary to form "intent" for purposes of this exclusion and determine whether the record contains substantial evidence that the insured had such mental capacity.

This litigation was instituted as a result of a collision occurring on November 18, 1976 when Patricia M. LeDoux drove her automobile directly into a pickup truck occupied by appellants Denny Lyons, Earsel Hall and Laura L. Lemon. The incident occurred on Cave Creek Road near its intersection with Pima Road in Maricopa County. Appellants sustained personal injuries as a result of the collision and filed suit against Mrs. LeDoux for damages.

Appellee Globe American Casualty Company, Mrs. LeDoux' automobile liability insurance carrier, filed a complaint for declaratory judgment against appellants and Mrs. LeDoux on April 14, 1977 in Maricopa County Superior Court. The complaint sought to have the court declare that a policy provision excluding coverage for intentional acts operated to preclude insurance coverage for Mrs. LeDoux' actions. On May 15, 1979, a trial to the court was held in the declaratory judgment action. Judgment was entered in favor of Globe American on August 24, 1979. Appellants filed a motion for new trial which was denied. This appeal followed.

Appellants have raised numerous issues on appeal. However, because our determination of the issues of mental capacity and sufficiency of the record relative to mental capacity requires a reversal of the judgment, our opinion addresses only those issues.

Appellee relies upon the following provision in its insurance contract with Mrs. LeDoux to deny coverage for her involvement in the collision.

This policy does not apply:

\* \* \* \* \* \*

(b) under all coverages . . . to any bodily injury or property damage (i) caused intentionally by or at the direction of the insured; . . . .

It is appellants' position that Mrs. LeDoux did not act intentionally because she was suffering from a mental illness that impaired her reasoning faculties to the extent that she was incapable of distinguishing right from wrong. More specifically, appellants argue that by driving her car into the vehicle in which appellants were riding, Mrs. LeDoux was attempting to commit suicide in an uncontrollable re-

sponse to auditory hallucinations that overcame her ability to act rationally.

Appellee contends that it is immaterial whether Mrs. LeDoux was insane at the time of the collision. Rather, appellee contends that Mrs. LeDoux' understanding of the physical consequences of her act and deliberate commission of the act are sufficient to deem the act "intentional" for purposes of exclusion of coverage. Appellee further argues that even if an understanding of the natural consequences of the act and the ability to differentiate between right and wrong are required, the evidence supports the conclusion that Mrs. LeDoux had such mental capacity.

Two distinct positions on the issue of the relationship between an actor's mental capacity and "intent" for purposes of insurance coverage have developed in other jurisdictions. One line of cases holds that if an injury results from an insane act, the intentional injury exclusion clause is inoperative and the insurer is liable. *See Congregation of Rodef Sholom of Marin v. American Motorists Ins. Co.,* 91 Cal.App.3d 690, 154 Cal. Rptr. 348 (1979); *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Dunkel,* 363 So.2d 190 (Fla. 1978); *George v. Stone,* 260 So.2d 259 (Fla. App.1972); *Ruvolo v. American Cas. Co.,* 39 N.J. 490, 189 A.2d 204 (1963). The other line of authority holds that an injury inflicted by a mentally ill person is "intentional" where the actor understands the physical nature of the consequences of the act and intends to cause the injury, even though he is incapable of distinguishing right from wrong. *See Colonial Life & Accident Ins. Co. v. Wagner,* 380 S.W.2d 224 (Ky.1964); *Rider v. Preferred Acc. Ins. Co. of N. Y.,* 182 App.Div. 42, 170 N.Y.S. 974 (1918); *Deloache v. Carolina Life Ins. Co.,* 233 S.C. 341, 104 S.E.2d 875 (1958); *Pruitt v. Life Ins. Co. of Virginia,* 182 S.C. 396, 189 S.E. 649 (1937).

The issue of the effect of the purported insanity of an insured upon the "intentional acts" exclusionary provision of an insurance policy has not been directly addressed in Arizona. However, the assumption that insanity can, as a matter of law, preclude the characterization of an act as "intentional" for insurance purposes is implicit in several Arizona decisions. *See, e.g., Steinmetz v. Nat. Am. Ins. Co.,* 121 Ariz. 268, 589 P.2d 911 (App.1978); *Cavanagh v. Ohio Farmers Ins. Co.,* 20 Ariz.App. 38, 509 P.2d 1075 (1973). This assumption was most recently expressed by Division Two of this court in *Parkinson v. Farmers Ins. Co.,* 122 Ariz. 343, 345, 594 P.2d 1039, 1041 (App.1979), wherein it was stated:

> Absent mental illness or intoxication destroying the capacity to form this intent [to cause injury] the intent exists when one acted under circumstances where the natural and probable consequence of the act is some injury.

However, Arizona courts have not determined what mental capacity is necessary to "intend" an injurious act for purposes of interpreting an exclusionary clause in an insurance contract.

The trial court in the instant case made a finding of fact that Mrs. LeDoux "intentionally" caused the collision. Based upon this finding of fact, the court concluded as a matter of law that appellee's insurance contract did not provide coverage because an individual is presumed to have intended the ordinary consequences of his voluntary actions. In so holding, the trial court cited *Clark v. Allstate Ins. Co.,* 22 Ariz.App. 601, 529 P.2d 1195 (1975). However, *Clark* does not address the effect of the mental illness on the presumption. Rather, that case dealt with intended acts versus intended consequences.

To hold, as appellees urge, that mental illness is irrelevant for purposes of determining whether an act is "intentional" is inconsistent with long standing policy considerations in insurance law. Exclusionary provisions are to be strictly construed against an insurer. *C. H. Leavell & Co. v. Fireman's Fund Ins. Co.,* 372 F.2d 784 (9th Cir. 1967); *Brenner v. Aetna Ins. Co.,* 8 Ariz.App. 272, 445 P.2d 474 (1968). Further, to deny coverage for acts caused by an individual lacking the mental capacity to act rationally is inconsistent with a primary purpose for incorporating intentional injury

exclusions into insurance policies, *i.e.*, to preclude individuals from benefiting financially when they deliberately cause injury. An individual who lacks the capacity to conform his behavior to acceptable standards will not be deterred by the existence or nonexistence of insurance coverage for the consequences of his acts. *See Congregation of Rodef Sholom of Marin v. American Motorists Ins. Co., supra.*

We recognize that some jurisdictions have held that the M'Naghten test for criminal insanity is the appropriate test for mental capacity to apply under these circumstances. *See, e.g., Markland v. Clover Leaf Casualty Co.,* 209 S.W. 602 (Mo.Ct. App.1919). *See generally* 10 Couch on Insurance 2d § 41:667 (1961). However, we are of the opinion that the better rule is set forth in *Congregation of Rodef Sholom of Marin v. American Motorists Ins. Co., supra,* and *Ruvolo v. American Cas. Co., supra,* which hold that the criminal standard is inappropriate. We find the following language by the New Jersey Supreme Court to be persuasive:

> It has been said many times that exclusionary clauses, drawn for the company by men learned in the law of insurance are to be strictly construed against the insurer; that the insured is entitled to protection to the full extent that any reasonable interpretation of them will permit. [citations omitted] And justice demands that particular emphasis be laid on that doctrine where the conduct insured against involves possible injury or damage to members of the public. For that reason, while such mental incapacity as would excuse an act from criminal responsibility would preserve the insured's protection under this policy, in our opinion coverage should not be limited to cases which satisfy that definition. We hold that if the insured was suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason and

while in that condition [acted] on an irrational impulse ... his act cannot be treated as "intentional" within the connotation of defendant's insurance contract. *Ruvolo v. American Cas. Co., supra,* 189 A.2d at 208–209. *See also Congregation of Rodef Sholom of Marin v. American Motorists Ins., supra,* 154 Cal.Rptr. at 352.

Applying this test to the instant case, if Mrs. LeDoux was suffering from mental derangement which deprived her of her capacity to act in accordance with reason and while in that condition acted on an irrational compulsion to drive her vehicle into oncoming traffic, her act was not "intentional". It is not clear whether the trial court applied this test for mental capacity to determine whether there was "intent". Nevertheless, if the judgment is correct, it will be affirmed even if based upon the wrong reasons. *Matter of Estate of Torstenson,* 125 Ariz. 373, 609 P.2d 1073 (App. 1980). Accordingly, we now consider whether there was substantial evidence to support a determination that Mrs. LeDoux was able to act in accordance with reason and was not acting in response to an irrational compulsion at the time of the collision. *See Siegrist v. Carrillo,* 112 Ariz. 218, 540 P.2d 690 (1975). In reviewing the record, we consider the evidence in the light most favorable to upholding the judgment. *McFarlin v. Hall,* 127 Ariz. 220, 619 P.2d 729 (1980).

The testimony relied upon by appellee consists primarily of observations by witnesses to the accident and law enforcement officials who talked to Mrs. LeDoux shortly after the accident. A brief summary of their pertinent testimony follows.[1]

A witness to the collision, Eleanor Schreyer, testified that she had observed Mrs. LeDoux driving next to her in the wrong lane of traffic. She stated that Mrs. LeDoux appeared calm and sure of herself and in control of her car while she was driving and remained calm after the accident.

1. The depositions of Francis T. Berry, Craig Rhoten, Pamela M. LeDoux, Laura Lemon and Earsel Hall were admitted into evidence. The only witnesses who testified at trial were Eleanor Schreyer, Thomas L. Brice, and Richard E. H. Duisberg, M.D.

Deputy Francis T. Berry of the Maricopa County Sheriff's Office, the first law enforcement officer to reach the site of the collision, testified that he observed that Mrs. LeDoux was in shock but no more upset than persons he customarily observed in the aftermath of traffic accidents. He also stated that she was cooperative and handed over her license when requested to do so.

Deputy Craig Rhoten of the Maricopa County Sheriff's Office, who arrived at the collision site after Deputy Berry, testified that after he placed Mrs. LeDoux in his car to interview her, she twice attempted to obtain his weapon, stating her intent to commit suicide. Deputy Rhoten then transferred her to Deputy Berry's patrol car to be taken to the county jail for preliminary booking procedures.

Deputy Thomas L. Brice, who interviewed Mrs. LeDoux at the county jail, testified concerning statements that Mrs. LeDoux made during the course of a 30–minute interview and described hypothetical questions which he posed concerning "right" and "wrong". Relying on her answers to his hypothetical questions, Deputy Brice expressed his opinion that Mrs. LeDoux understood the difference between right and wrong.

Mrs. LeDoux' conversation with Deputy Brice occurred approximately four hours after the accident. Deputy Brice testified under cross-examination that Mrs. LeDoux was unable to identify the date or the day of the week, would not respond to a number of questions, and gave him what he described as "blank stares". He further indicated that Mrs. LeDoux said she was "hearing things", and when he inquired as to what she was hearing, she replied: "My whole family is being killed in a horrible way." He also stated that Mrs. LeDoux indicated that she would not live through the night and the Mafia was after her.

Appellants testified that Mrs. LeDoux had apologized and said the accident was her fault. However, she also stated she had no memory of the accident.

In criminal cases, Arizona has held that the testimony of lay witnesses with respect to the sanity of an individual is admissible where supported by personal observations or knowledge of the defendant's past conduct and history. *State v. Corley*, 108 Ariz. 240, 495 P.2d 470 (1972); *State v. Coey*, 82 Ariz. 133, 309 P.2d 260 (1957). Our supreme court has also held that where there is competent lay testimony relating to insanity which is in conflict with expert medical testimony, the trier of fact is free to accept the lay testimony as a basis for its verdict and reject the expert testimony. *State v. Overton*, 114 Ariz. 553, 562 P.2d 726 (1977).

If the State relies on lay testimony to establish sanity in criminal cases, the following standard applies:

> [T]here must have existed an intimacy between the witness and the defendant of such a character and duration that the witness' testimony is of probative value to establish that defendant knew the nature and quality of his act and that he knew it was wrong . . . .

*State v. Overton, supra*, 114 Ariz. at 556, 562 P.2d at 729.

We are of the opinion that the requirement of a contact of such character and duration to be probative is similarly applicable in a civil case where lay testimony is relied upon to contradict positive testimony by an expert witness. In the instant case, the contact by the lay witnesses with Mrs. LeDoux was of such a nature as to cast grave doubts upon its probative value.

Eleanor Schreyer was driving along the same road as Mrs. LeDoux and observed Mrs. LeDoux for only a few minutes before and after the accident.

The testimony of Officers Rhoten and Berry, even when viewed in a light most favorable to upholding the judgment, consists simply of observations that at various stages following the accident, Mrs. LeDoux appeared to be calm, in shock, cooperative and suicidal.

Deputy Brice's contact with Mrs. LeDoux was of longer duration, and he concluded that she had deliberately caused the acci-

dent and had appropriately answered certain hypothetical questions relating to right and wrong actions. However, his testimony also indicates that she failed to respond to several questions, most significantly, a question concerning whether it was right or wrong to commit suicide.

In contrast to this testimony by persons having observed or talked to Mrs. LeDoux over a relatively short time span are the medical records which were introduced into evidence and the testimony of a psychiatrist who had treated Mrs. LeDoux during one of her hospitalizations. The medical records reflect the following history. Mrs. LeDoux was hospitalized on September 24, 1976, at which time she was diagnosed as paranoid schizophrenic and engaging in habitually excessive drinking. She left the hospital without permission on October 14, 1976, when she was found lying in a Phoenix street, apparently in an attempt to commit suicide. She was readmitted to the hospital and seen by Dr. Richard Duisberg, a psychiatrist and the only expert witness to testify at trial. Dr. Duisberg treated Mrs. LeDoux from late October 1976 until approximately November 12, 1976. He diagnosed her as having acute brain syndrome and hallucinosis as a result of alcohol abuse. Part of the treatment from Dr. Duisberg consisted of electric shock treatments in order to relieve Mrs. LeDoux of auditory hallucinations. These hallucinations consisted of voices and screaming concerning the killing of members of her family. Mrs. LeDoux was discharged from the hospital on November 5, 1976, when she took up residence at an alcoholic halfway house where she resided until November 18, 1976, one day prior to the collision.

Mrs. LeDoux' deposition testimony indicates that she consulted Dr. Duisberg while she was residing at the halfway house because she was hallucinating. Dr. Duisberg recommended certain drugs but the rules of the halfway house prohibited taking any drugs. Mrs. LeDoux stated that she finally left the halfway house because she was hallucinating and unsuccessfully attempted

to contact Dr. Duisberg or another doctor on November 18, 1976, the date of the accident. On November 19, 1976, Mrs. LeDoux was admitted to Maricopa County General Hospital with a diagnosis of "schizophrenia, schizo-affective-type depressed". On November 24, 1976, she was discharged from the county hospital and admitted to Arizona State Hospital with a diagnosis of "schizophrenia".

Portions of Dr. Duisberg's testimony relative to Mrs. LeDoux' ability to act in accordance with reason is as follows:

Q And would you tell us what your opinion is, or was of her mental condition at that time?

\*    \*    \*    \*    \*    \*

THE WITNESS: I have an opinion that she had had a recurrence of hallucinatory activity, the voices, the screaming, the torturing, and so forth, that she was plagued with, and that as in previous occasions her reaction, among other things, included self-destruction, suicide to free the voices, and for whatever other conscious motives. In other words, she was delusional and knew of no better solution at the moment.

Q And, doctor, do you have an opinion based upon a reasonable degree of medical certainty, and based upon your review of the documents and records that I just indicated as to whether or not Mrs. LeDoux at the time of the accident on November 18, 1976, was able to rationally distinguish between right and wrong?

\*    \*    \*    \*    \*    \*

THE WITNESS: When a person is suffering a delusion then their judgments made, by such an overwhelming bunch of real-seeming situations, obviously not rational, but it is distorted by the delusional content of their thinking.

Q So, is it your testimony that she could not rationally distinguish between right and wrong at the time of the accident?

A   She could not make a rational decision in that; yes.[2]

\*    \*    \*    \*    \*    \*

Q   Doctor, would you say within a reasonable degree of medical certainty that she was unable or that her ability to reason was so impaired as to deprive her of the ability to govern her conduct in a rational way?

\*    \*    \*    \*    \*    \*

THE WITNESS: Yes, she could not make a sane decision.

\*    \*    \*    \*    \*    \*

Q   ... Is it your testimony, doctor, that she felt compelled to take her own life because of these hallucinatory voices that she was hearing?

A   I think she was trying to escape that type of situation, yes. It was intolerable to her.

Q   And that those voices to her compelled her into this action; is that correct?

A   That's my feeling.

■■■■   In matters of factual dispute this court defers to the trial court unless the trial court's finding is clearly erroneous. *Carrasco v. Carrasco*, 4 Ariz.App. 580, 422 P.2d 411 (1967). However, where facts are not in dispute and where the trial court's findings of fact are in many respects conclusions of law, this court is not bound by them. *State Tax Commission v. Howard P. Foley Co.*, 13 Ariz.App. 85, 474 P.2d 444 (1970). In the instant case, the trial court made a finding of fact that Mrs. LeDoux acted intentionally. However, as previously discussed, this determination is a mixed question of law and fact. We find that the record does not contain substantial evidence that Mrs. LeDoux was able to act in accordance with reason at the time of the collision. The observations of lay witnesses relied upon by appellee do not involve that intimacy of contact necessary to be probative on the issue of Mrs. LeDoux' mental condition at the time of the accident. While witnesses described Mrs. LeDoux' behavior as controlled and calm, this does not negate the positive testimony that Mrs. LeDoux was suffering from a mental derangement making it impossible for her to act in accordance with reason. As our supreme court said in *State v. Overton, supra*, 114 Ariz. at 556, 562 P.2d at 729:

> Talking irrationally could be indicative of an unsound mind. But the converse, talking normally, does not negate the more subtle and insidious forms of insanity with which the mind may be possessed.

In light of the overwhelming testimony that Mrs. LeDoux was unable to act in accordance with reason at the time of the collision, we hold that appellee's policy exclusion for injury or property damage caused intentionally by its insured does not preclude Mrs. LeDoux from coverage pursuant to her policy.

The judgment of the trial court is reversed with directions to enter judgment in appellants' favor consistent with this opinion.

JOE W. CONTRERAS, P. J., and CORCORAN, J., concur.

---

2.  We note that even if the M'Naghten test for criminal insanity were applicable, *i.e.*, that the actor was unable to understand the natural consequences of the act or to distinguish between right or wrong, Mrs. LeDoux would have lacked the requisite mental capacity. It was Dr. Duisberg's opinion that while Mrs. LeDoux did understand the quality of her act, she was unable to distinguish right from wrong.