## KEVIN M. JOHNSON

### V.

## INSURANCE COMPANY OF NORTH AMERICA

Record No. 831708

November 26, 1986

Present: All the Justices

*Christopher Allen Meyer (Allen, Allen, Allen and Allen,* on briefs), for appellant.

*Steven Colin McCallum (McGuire, Woods & Battle,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this insurance case, we decide whether an intentional injury exclusion clause in a homeowners policy precludes coverage for an insured who, while mentally ill, shot and injured a friend.

On February 10, 1982, Linwood Clyde Davis shot appellant Kevin M. Johnson in Johnson's home in the City of Richmond. Davis and Johnson had been acquainted for many years. Davis, age 27, formerly had been "a mild mannered type person." Within two years before the incident, however, upon return from college in California, Davis became "flighty" and "spacey" with a history of drug use. During the period, he was hospitalized for psychiatric care.

On the day in question, Davis, who lived with his parents, planned to kill Johnson. Davis searched his house for a gun, found a .22 caliber pistol, put bullets in the weapon, and went to the victim's house. Upon arrival, Johnson was not at home. Davis talked with the victim's mother-in-law and waited for the victim to return. When the victim entered the dwelling, Davis began conversing with him, and, without warning, fired about six shots at the victim from close range, injuring him severely. After the shooting, Davis offered no resistance when the victim's wife "took the gun out of [Davis'] hand and put it in a drawer."

Davis was arrested and gave a statement to the police within 15 hours of the shooting. When asked to describe the incident, Davis stated, "Um, I went over there to see him, and after I saw him, I pulled out the gun and shot him." Davis denied that the victim

owed him money, that the two had argued, or that he was "trying to get revenge on him." When asked the motive for the assault, Davis said, "I just wanted to shoot him."

Later during the police interview, Davis claimed that the victim had "stole just about everything I had." He also said the victim killed Davis' dog and "he's done countless things to me that I just put up with . . . he kept on harassing . . . my girl." Actually, the foregoing accusations had no basis in fact.

Finally, Davis told the police that he had planned to "put an end" to the victim's conduct. He stated, "So, I went home, I got my gun, you know, and I said well, I'm gonna go over here, and I'm gonna shoot Kevin, you know. So, when um I got over there, you know, I, I shot him." Davis also stated, "I would have to say I meant to kill him. . . . I think deep down you know, that that was my main motive, you know."

During the five months after his arrest, Davis was examined by two psychiatrists and a forensic psychologist. Davis stated to these doctors that, during the time he was in California, he began receiving commands from God and hearing other voices. He said that God ordered him to leave California. Upon his return to Richmond, Davis believed that the victim began projecting his voice into Davis' mind. At times, Davis said, the victim's voice prevented him from hearing the voice of God, who had selected him "to be something." Davis claimed that "his thoughts were controlled by others" and that his behavior was motivated by those thoughts causing him to lose "control." He told the doctors that on the day of the incident God had commanded him to kill the victim and that he obeyed God's order.

Each of the doctors concluded that Davis was mentally ill at the time of the shooting. One psychiatrist concluded that Davis "was undergoing paranoid schizophrenic delusions consisting of auditory hallucinations of persecutory belief which led to him carrying out the alleged offense." He stated that Davis "was not aware of the nature, quality, and consequences of his act and as such he was undergoing psychotic experiences or mental illness which made him not responsible for the act." This physician also was of opinion there was "no question" that Davis intended to shoot the victim "under the false belief that [he] was his enemy and the voices controlling him [made] him have the feeling that if I don't get this man he will get me, which was a false thought as a result of mental illness."

The other psychiatrist was of opinion that Davis "was suffering from an incapacitating emotional illness and the behavior for which he was charged was a product of that illness, that he therefore was unable to appreciate the wrongfulness of his actions and conform his behavior to the right." This physician stated that Davis "discharged the gun several times with the intent of inflicting harm on the victim," and that Davis intended to shoot the victim in the sense he pulled the trigger and that this act was not inadvertent or accidental. He said, however, Davis was not capable of "reasonably deciding I'm going to do this and doing it."

The psychologist was of the following opinion: "At the time of the shooting of Kevin Johnson[, Davis] was suffering from schizophrenia of a paranoid type. He was delusional. He did not know the nature and consequences of his act or the difference in right and wrong." When asked whether Davis intended to shoot the victim, the psychologist responded, "Not exactly. It's not clear . . . whether he was trying to frighten him or what he was trying to do other than acting at the behest of the deity, the [A]lmighty, and he was doing what God directed him to do as far as we are able to determine." The psychologist further stated, "One can argue . . . that this is something that he intended to do, intended to shoot, but it's also possible to construe from this he was acting under the influence of this delusion and [the act was] not intentional."

Davis' deposition was taken 11 months after the incident while he was confined for treatment at Central State Hospital. He testified that he was "doing great now," that he was "well," and "just here going through the program." One psychiatrist previously had said on the day of the deposition that Davis had "improved," that "the voices are under control," that "he could recognize the truth from falsity," but that "he has yet to prove his safety to be among the public at large."

During the deposition, Davis stated he shot Johnson because he felt God had told him to shoot the victim. He said, "I felt as though if I don't carry out the order of God I will just let everybody down." Testifying "I really can't say I meant to do it," Davis stated, "when I thought God gave me the order I thought that was the highest command you could go and I had these pressures and hearing these voices in my head — I was hearing sounds like Popeye and all these comedy people."

When asked why he told the police he intended to shoot and kill Johnson, Davis stated "I was looking for excuses to try to get out

of what I did." Later in the deposition, when asked whether he was shooting in the victim's direction and whether he intended to "hit" Johnson with the gun, Davis said, "Yes, sir, I intended to shoot him."

The parties stipulated that Davis pleaded not guilty by reason of insanity in the criminal action arising from the shooting. The plea was accepted by the criminal court, and Davis is now confined to Central State Hospital.

Following the incident, the victim Johnson instituted an action for damages against Davis and his parents, Lloyd and Alma Hughes. Davis was Mrs. Hughes' son and resided with the Hugheses at the time of the shooting.

Appellee Insurance Company of North America had issued to the Hugheses a homeowners policy with comprehensive personal liability coverage which was in effect on the day of the shooting. Davis qualified as an "insured" under the policy.

In the policy, the insurer agreed to indemnify the insured for legal liability resulting from bodily injury "caused by an occurrence." The policy defined "occurrence" to mean "an accident, including injurious exposure to conditions which results, during the policy term, in bodily injury or property damage." The policy excluded coverage for "bodily injury or property damage which is either expected or intended from the standpoint of the insured."

After the damage suit was filed, the insurer instituted the present proceeding by a bill of complaint for declaratory judgment, naming Davis, the Hugheses, and Johnson as defendants. The insurer alleged the incident was not covered by the policy because (1) it was not an accident and (2) the wounds to the victim were expected or intended from the standpoint of Davis. The insurer asked the court to declare that Davis' act was not covered by the policy and that the insurer had no duty to defend the damage suit or to pay any sum which any defendant may become legally obligated to pay.

The trial court considered depositions of Davis, the mental health professionals, the victim, and his wife. In addition, the court considered the insurance policy, the police statement, and argument of counsel. The court concluded that "an occurrence is an accident from the point of view of the victim, not from the standpoint of the insured." Thus, on the first issue, the court found that the incident was covered by the insuring clause of the policy. On the second issue, the court decided that the exclusion

clause applied to remove the incident from coverage. In a memorandum opinion, the trial judge stated

> "It has been argued that Davis was insane at the time of the shooting, but it is clear from the record that even though Davis was mentally ill, he was aware of his actions and of the consequences of those actions. He intended to shoot Kevin Johnson and he did so. This is to be distinguished from the actions of a person so insane as to not be aware of his actions or the consequences of his actions. In this case, Davis may have been prompted by or acting under delusional beliefs, but he was aware of what he was doing and intended the resulting injury."

We awarded the victim this appeal from the July 1983 final order entered upon the ruling in favor of the insurer. The remaining defendants did not file notices of appeal although Davis' guardian ad litem submitted a statement endorsing the appellant's argument. On appeal, the victim argues the trial court decided the second issue incorrectly; the insurer, by cross-error, asserts the ruling on the first issue was wrong.

At the outset, we review several settled principles applicable here. The evidence on the factual question of intention was conflicting. Because that evidence was presented by deposition and a written statement, the trial judge did not see and hear the witnesses. Thus, the court's finding of fact is not binding on us, but it is highly persuasive and entitled to great weight. *Kaplan* v. *Copeland*, 183 Va. 589, 593, 32 S.E.2d 678, 679 (1945). In addition, language in an insurance policy purporting to exclude coverage for certain events will be construed most strongly against the insurer. *St. Paul Ins.* v. *Nusbaum & Co.*, 227 Va. 407, 411, 316 S.E.2d 734, 736 (1984). Also, the burden is on the insurer to prove that an exclusion applies. *White* v. *State Farm*, 208 Va. 394, 396, 157 S.E.2d 925, 927 (1967). Because of the view we take of the exclusion issue, we do not reach for decision the question whether this incident was an "occurrence." We will agree with the victim and assume it was.

The issue whether an intentional injury exclusion clause precludes coverage for Davis under these circumstances is a question of first impression for this Court. Elsewhere, there are two conflicting lines of authority. One set of cases, relied on by the victim,

holds that if an insured is suffering from a mental illness, the insured's act cannot be treated as "intentional" within such a clause. *See Globe American Casualty Co.* v. *Lyons*, 131 Ariz. 337, 641 P.2d 251 (1981); *Congregation of Rodef Sholom of Marin* v. *American Motorists Ins. Co.*, 91 Cal.App. 3d 690, 154 Cal. Rptr. 348 (1979); *Mangus* v. *Western Cas. and Surety Co.*, 41 Colo. App. 217, 585 P.2d 304 (1978); *Arkwright-Boston Mfrs. Mut. Ins. Co.* v. *Dunkel*, 363 So.2d 190 (Fla. App. 1978); *von Dameck* v. *St. Paul Fire & Marine Ins. Co.*, 361 So.2d 283 (La. App. 1978); *Ruvolo* v. *American Cas. Co.*, 39 N.J. 490, 189 A.2d 204 (1963). This view is based upon the idea that the purpose of incorporating intentional injury exclusions into insurance policies is to preclude persons from benefiting financially when they cause injury. Thus, an individual who lacks mental capacity to conform his conduct to acceptable standards will not be deterred by the existence or nonexistence of insurance coverage for the consequences of his conduct. *Globe American Casualty Co.*, 131 Ariz. at 340, 641 P.2d at 254.

The other line of cases, embraced by the insurer, holds that an injury inflicted by a person who is mentally ill may be "intentional" within the meaning of the exclusion. These decisions are usually based on evidence showing that the actor understood the physical nature and consequences of his conduct, and had the purpose and volition to cause the injury, although he was mentally incapable of distinguishing between right and wrong. *See Colonial Life & Accident Ins. Co.* v. *Wagner*, 380 S.W.2d 224 (Ky. 1964); *Kipnis* v. *Antoine*, 472 F.Supp. 215 (N.D. Miss. 1979); *Rider* v. *Preferred Acc. Ins. Co.*, 170 N.Y.S. 974 (1918), *aff'd* 230 N.Y. 530, 130 N.E. 881 (1920); *DeLoache* v. *Carolina Life Ins. Co.*, 233 S.C. 341, 104 S.E.2d 875 (1958); *Pruitt* v. *Life Ins. Co. of Va.*, 182 S.C. 396, 189 S.E. 649 (1937). *See also Rajspic* v. *Nationwide Mut. Ins. Co.*, 110 Idaho 729, 718 P.2d 1167 (1986); *Rajspic* v. *Nationwide Mut. Ins. Co.*, 104 Idaho 662, 662 P.2d 534 (1983). *See generally* 10 Couch on Insurance 2d, § 41:676 (rev. ed. 1982); Annot., 33 A.L.R.4th 983.

In the present case, the victim, appropriately observing that we must view the evidence in the light most favorable to the insurer which prevailed below, states on brief: "Linwood Davis was not so insane that he did not know that he had a gun in his hand, that Kevin Johnson was in front of him, and that he was pulling the trigger and shooting Kevin Johnson." He further says that Davis'

"statements in his own deposition and to the police officer following the shooting indicate that he did have this minimal degree of awareness of his actions." This is an accurate analysis of the evidence when we employ the appellate standard applicable here and give "great weight" to the trial court's finding.

The victim argues, however, that the exclusion does not apply and Davis is entitled to coverage because he was incapable of controlling or desisting from the actions causing the injury. We reject this argument.

■ In effect, the victim argues that, legally, one mind may not simultaneously be partly normal and substantially abnormal. But we have already confronted a similar dichotomy in the criminal context in *Price* v. *Commonwealth*, 228 Va. 452, 323 S.E.2d 106 (1984). There we stated that the two elements of the *M'Naghten* Rule, nature-of-the-act test and right-wrong test, logically can be separated. Quoting from a criminal treatise, we said

> " 'The first portion of M'Naghten relates to an accused who is psychotic to an extreme degree. It assumes an accused who, because of mental disease, did not know the nature and quality of his act; he simply did not know what he was doing. For example, in crushing the skull of a human being with an iron bar, he believed that he was smashing a glass jar. The latter portion of M'Naghten relates to an accused who knew the nature and quality of his act. He knew what he was doing; he knew that he was crushing the skull of a human being with an iron bar. However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God.' " 228 Va. at 459-60, 323 S.E.2d at 110.

■ Here, when Davis aimed the pistol at Johnson, he knew that he was shooting a human being. Acting deliberately and methodically, Davis had searched for and found a pistol, loaded it, travelled to the victim's home, waited for him, begun talking with him, and shot him from close range. He acted with resolve and determination, not knowing that what he was doing was wrong because God had ordered him to act. In pointing the pistol at Johnson, Davis did not think, for example, that he was peeling a banana; he was not psychotic to an extreme degree, as the victim readily recognizes when he notes that Davis "did have this mini-

mal degree of awareness of his actions." That is sufficient. The shooting was not accidental, a risk insured against, but intentional.

On the surface, there appears to be a blatant inconsistency in concluding, as we do, that a person may be criminally insane when shooting another, and thus avoid full criminal sanctions, and yet that same individual can be denied insurance coverage because he "intended" to shoot his victim. A more careful analysis, however, will reveal there is no inconsistency at all.

In the law, there are many situations in which a person may intentionally injure or kill another and not be subject to criminal punishment. For example, an individual may kill in self-defense. The executioner may kill with the sanction of the State. A soldier may injure or kill under rules of combat. This conduct is intentional, but it is also excusable. Likewise, an individual may be excused from penalty if he is insane at the time he commits a criminal act. As here, he may do the act with every intention of consummating it, but when it is shown that he was mentally ill, he is excused from the imposition of the usual sanctions. "The absence of punishment, however, does not retrospectively expunge the original intention." *Colonial Life & Accident Ins. Co.*, 380 S.W.2d at 226.

In sum, we hold, in the words of the trial judge, that Davis "intended to shoot Kevin Johnson and he did so." The insurer carried the burden to establish that Davis was aware of what he was doing and that he intended injury to Johnson. Therefore, the exclusion applies.

For these reasons, the judgment of the trial court will be

*Affirmed.*

STEPHENSON, J., dissenting.

Insurance policies are to be liberally construed in favor of an insured. Thus, clauses in a policy purporting to exclude coverage must be strictly construed against an insurer. *Ayres* v. *Harleysville Mut. Cas. Co.*, 172 Va. 383, 389, 2 S.E.2d 303, 305 (1939). Any doubt about the meaning of policy language must be resolved against the insurance company. *Id.*

Nonetheless, the majority, by applying a narrow concept of insanity, gives the clause at issue a liberal reading. Under the majority's view, exclusionary clauses will operate to exclude coverage

for an insured adjudged criminally insane under *M'Naghten*'s right-wrong test.

Denial of insurance coverage for individuals lacking the mental capacity to act rationally is simply inconsistent with the purpose of exclusionary clauses. Excluding intentional injury from coverage promotes the policy that an individual who deliberately causes injury to another should not be exempt from the financial consequences of his intentional act. Exclusionary clauses also help deter wrongful conduct by denying coverage for acts within an insured's control. However, the existence or nonexistence of insurance coverage will in no way influence or deter an individual whose insanity prevents him from conforming his behavior to acceptable standards.

When a mentally-ill insured is unable to control his conduct, I would hold that his irrational and impulsive act cannot be regarded as "intentional" within the context of an exclusionary clause. This view, recently adopted by a number of jurisdictions, is consistent with long-standing policy considerations in insurance law. *See, e.g., Ruvolo* v. *American Cas. Co.*, 39 N.J. 490, 497-98, 189 A.2d 204, 208-09 (1963). *See generally* Annot., 33 A.L.R.4th 983.

Accordingly, I respectfully dissent.