443 S.E.2d 455

**MUNICIPAL MUTUAL INSURANCE COMPANY OF WEST VIRGINIA,**
Plaintiff–Appellee

v.

**Denver L. MANGUS and Lucille Mangus,**
Defendants–Appellants

and

**Rickey Lee Fields, Sr., Intervenor–Appellant.**

**No. 21763.**

Supreme Court of Appeals of
West Virginia.

Submitted March 8, 1994.

Decided March 24, 1994.

Dissenting Opinion of Justice Miller
April 20, 1994.

Johnnie E. Brown and Molly Underwood–Korwan, MacQueen & Brown, L.C., Charleston, for plaintiff-appellee.

E. Dandridge McDonald, McDonald & Rodecker, and James M. Cagle, Charleston, for intervenor-appellant.

R. Edison Hill, Hill, Peterson, Carper, Bee & Deitzler, Charleston, for defendants-appellants.

NEELY, Justice:

This appeal, arising out of a 1987 shooting in Kanawha County, raises a question of first impression in this jurisdiction: whether the intentional acts exclusion clause of an insured's homeowners' policy, which excludes coverage for acts "expected or intended by the insured," defeats coverage when the insured is mentally ill at the time he injures another.

For many years, a fence divided the properties of Rickey Lee Fields, Sr. and Denver Mangus. The fence is located on Mr. Fields' lot, Mr. Fields' property line standing several inches on Mr. Mangus' side of the fence.

During the winter of 1987, Mr. Mangus attached a fencepost to the fence without the permission of Mr. Fields. Despite several requests from Mr. Fields to remove the fencepost, Mr. Mangus took no action.

On 26 July 1987, Mr. Fields walked across his yard to the fencepost and began shaking it. From his back porch, approximately twenty feet away, Mr. Mangus yelled "You get out of here or I'm going to shoot you." Mr. Fields continued to shake the post. Mr. Mangus disappeared into his house and returned moments later wielding a 12–gauge shotgun. As Mr. Fields looked up into the shotgun barrel, a blast hit him in his face, arm and shoulder. As a result of the shooting, Mr. Fields suffered extensive and permanent damage to his eyes, teeth, hand, shoulder and chest.

It is undisputed that Mr. Mangus shot Mr. Fields on the day in question. It is also undisputed that on the day of the shooting Mr. Mangus was an insured in a homeowners policy issued by Municipal Mutual Company of West Virginia ("Municipal Mutual"). The insurance policy in question contains the following language:

*Section II—Exclusions*

Coverage E—Personal Liability and

Coverage F—Medical Payments to Others do not apply to bodily injury or property damage:

a. Which is expected or intended by the insured.

What is disputed is the applicability of liability coverage to Mr. Mangus' criminal acts.

After Mr. Fields filed a tort suit against Mr. Mangus in the Circuit Court of Kanawha County seeking damages for the personal injuries he sustained as a result of the shotgun blast on 3 September 1987, Municipal Mutual brought a declaratory judgment action asking the Circuit Court of Kanawha County to declare that the insurance company had no responsibility under the policy because the liability insurance coverage had an expressed exclusionary clause relieving it

from coverage in the event of an insured's intentional act. Meanwhile, Mr. Mangus served a term in prison for the shooting.[1] Further proceedings in the tort action were stayed pending the outcome of the declaratory judgment action.

Both the insurer and the insured filed motions for summary judgment in the declaratory judgment action. In denying the motions, Judge A. Andrew MacQueen held that although the exclusionary clause does not operate to foreclose coverage in the underlying tort claim, as a general matter mental illness does not prevent an insured from expecting or intending his actions. The best rule, according to Judge MacQueen, would track the criminal insanity standard in West Virginia: first, whether the insured was suffering from a mental disease or defect; and second, whether, as a result of the insured's disease or defect, the insured was unable to appreciate the wrongfulness of his act or to conform his actions to the requirements of the law.

At trial, however, the Honorable Patrick Casey instructed the jury to consider not only the criminal test for insanity in West Virginia, but also to consider whether the insured, at the time of the act, had a "sufficient" degree of awareness of his actions to intend to shoot the victim and to expect that such action might cause injury. The court propounded three special interrogatories to the jury:

A. Did Denver Mangus possess sufficient degree of awareness of reality to intend to shoot Rickey Fields?

B. Did Mr. Mangus possess sufficient degree of rational mental ability or sufficient degree of mental ability to reasonably expect that his action might injure Mr. Fields?

C. At the time he shot Rickey Fields did Denver Mangus, as the result of a mental disease or defect, lack substantial capacity either to appreciate the wrongfulness of

---

1. Much moment is made of the fact that Mr. Mangus' plea of *nolo contendere* to the criminal charge of maliciously wounding Mr. Fields could not be used to estop collaterally his position that he was criminally insane. Although for our pur- poses in this case we need not address this issue, the facts appear obvious from the record below that for the purposes of interpreting the insur- ance policy language, Mr. Mangus' act of shoot- ing Mr. Fields was intentional.

his act or to conform his act to the requirements of the law?

The jury answered "yes" to all these questions.

All parties moved the court for judgment on the verdict. On 31 January 1992, Judge Casey entered judgment for the insurance company. Mr. and Mrs. Mangus and Mr. Fields now appeal.

### I.

■ The issue of the effect of the purported insanity of an insured upon the "intentional acts" exclusionary provision of an insurance policy has yet to be addressed in West Virginia. Elsewhere, two distinct positions on the issue of the relationship between an actor's mental capacity and "intent" for purposes of insurance coverage have developed. One line of cases, embraced by the insured in this case, holds that if an injury results from an insane act, the intentional injury exclusion clause is inoperative and the insurer is liable. *See Globe American Casualty Co. v. Lyons,* 131 Ariz. 337, 641 P.2d 251 (1981); *Congregation of Rodef Sholom of Marin v. American Motorists Ins. Co.,* 91 Cal.App.3d 690, 154 Cal.Rptr. 348 (1979); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Dunkel,* 363 So.2d 190 (Fla.1978); *Mangus v. Western Cas. and Surety Co.,* 41 Colo.App. 217, 585 P.2d 304 (1978); *Von Dameck v. St. Paul Fire & Marine Ins. Co.,* 361 So.2d 283 (La.App. 1978); *George v. Stone,* 260 So.2d 259 (Fla. App.1972); *Ruvolo v. American Cas. Co.,* 39 N.J. 490, 189 A.2d 204 (1963). The opposing line of authority, espoused by the insurer, holds that an injury inflicted by a mentally ill person is "intentional" where the actor understands the physical nature of the consequences of the act and intends to cause the injury, even though he is incapable of distinguishing between right from wrong. *See Johnson v. Insurance Co. of North American,* 232 Va. 340, 350 S.E.2d 616 (1986); *Colonial Life & Accident Ins. Co. v. Wagner,* 380 S.W.2d 224 (Ky.1964); *Kipnis v. Antoine,* 472 F.Supp. 215 (N.D.Miss.1979); *Rider v. Preferred Acc. Ins. Co.,* 183 A.D. 42, 170 N.Y.S. 974 (1918); *aff'd* 230 N.Y. 530, 130 N.E. 881 (1920); *DeLoache v. Carolina Life Ins. Co.,* 233 S.C. 341, 104 S.E.2d 875 (1958);

*Rajspic v. Nationwide Mut. Ins. Co.,* 110 Idaho 729, 718 P.2d 1167 (1986); *Rajspic v. Nationwide Mut. Ins. Co.,* 104 Idaho 662, 662 P.2d 534 (1983). *See generally* 10 Couch on Insurance 2d § 41:676 (rev. ed. 1982); Annot. 33 A.L.R.4th 983.

To accept the insured's argument that insanity or mental illness precludes one from expecting or intending the results of his actions ignores the continuum on which degrees of mental illness clinically exist. In *Johnson, supra,* the court recognized that one mind may simultaneously be partly normal and substantially abnormal. Thus, one crushing the skull of a human being with an iron bar may believe he is smashing a glass jar. Another engaging in the same act may know that he is crushing the skull of a human being with an iron bar but because of mental disease, not know that what he is doing is wrong. He may believe, for example, that he is carrying out a command from God.

In the case before us, psychiatric testimony revealed that Mr. Mangus suffered from clinical depression with psychotic features and that at the time of the shooting Mr. Mangus was on drugs designed to lower his anxiety, affect his mood and relieve his breathing. Additionally, he suffered from insomnia, loss of appetite and weight, crying spells and heart and lung disease. Mr. Mangus testified to his belief that: (1) his neighbors were conspiring to drive him off his land because his wife, a former schoolteacher, knew the family secrets of the neighbors; (2) his phone was tapped; and (3) the traffic along his driveway in common with others was caused by the neighbors' involvement in drug dealing.

Nevertheless, Dr. Neilan, the psychiatrist who offered expert testimony in support of the contention that Mr. Mangus was insane, admitted that when Mr. Mangus went into his house, he knew he was picking up a gun and not a banana; that when he went outside with that gun, he knew he was pointing the gun at a man and knew that man was Rickey Fields. Mr. Mangus himself admitted that he knew that it was wrong to shoot a man. In short, there is no question that although Mr. Mangus suffered from clinical depression

or delusions in certain aspects of his life, he fully understood what he was doing at the time he shot Mr. Fields. That is sufficient. The shooting was not accidental, a risk insured against, but intentional.

It appears blatantly inconsistent that we might determine that a person can be suffering from such a severe mental illness when shooting another that he may avoid full criminal sanctions, yet conclude in a different context that the same person can be denied insurance coverage because he "intended" to shoot his victim. As the Court of Appeals of Kentucky in *Colonial Life, supra,* explains, however, there is no such inconsistency:

> In law, there are many conditions under which a person may intentionally kill and not be subject to criminal punishment. A man may kill in self-defense. A soldier may kill under liberal rules. The executioner may kill with the sanction of the State. All of this destruction is intentional, but excusable. Similarly, a person may be excused from penalty if he is insane at the time he commits a criminal act. He may do the act with every intention of consummating it, but if it is shown that he was mentally insufficient, he is excused from the imposition of the usual sanctions. The absence of punishment, however, does not expunge the original intention.

Thus, because the rules governing insurance law are based upon different principles and produce entirely different results from the law governing criminal matters, the fact that an excuse is provided for an insane person who commits an intentional act in our criminal system does not mean that a reasonable person would think that the drafters of an insurance contract intended such acts not to be covered by an "intentional acts" exclusion.

Indeed, if a person is so delusional that he shoots another human believing him to be a charging elephant, or shoves a knife in another's throat thinking that he is handing him an ice cream cone, then for insurance contract purposes the act is not "intentional."[2] Rational purchasers of insurance, fully appreciating that the human body is an electro-chemical machine capable of breaking down entirely, would want to insure themselves against such unlikely occurrences as a period of total delusion. At the same time, however, the rational purchaser of insurance who does not plan to commit intentional torts does not want to pay premiums to provide a fund that will guard the property of those entirely devoid of self-control, regardless of the reasons for that lack of control.

## II

Mr. Mangus urges us to embrace the test for criminal insanity in West Virginia in cases where an insured who is mentally ill at the time he injures another, seeks coverage under a homeowners policy with an intentional acts exclusion clause. Specifically, he argues that if an insured lacks *substantial* capacity to appreciate the wrongfulness of his act and does not possess a *substantial* ability to conform his acts to the requirements of law due to mental illness and in that state causes harm—the test for criminal insanity in West Virginia—the act may not be said to be truly intentional and thus should be insured.

■ We reject this argument and instead adopt the standard enunciated by the *Johnson, supra* court, which held that coverage under an intentional injury exclusion clause in a homeowners insurance policy may be denied when one who commits a criminal act has a minimal awareness of the nature of his act. The test for criminal insanity in West Virginia is appropriate only in a criminal trial and has no applicability to the interpretation of plain language in an insurance contract.

---

**2.** In a similar vein, we held in *State v. Brant,* 162 W.Va. 762, 252 S.E.2d 901 (1979), that intoxication can only be used as a defense when it is shown that the intoxicated person had such a total lack of capacity that his bodily machine completely fails. We reached this holding on the rationale that a rule which permits a defendant to plead that because of his intoxication his ca-

pacity to control himself or to form a specific intent was diminished would provide every would-be malefactor with a convenient excuse which would appear sufficiently reasonable to confuse any jury. Allowing insurance coverage under an "intentional acts" exclusion clause for any insured who claims he lacked capacity to control his actions presents the same problem.

## III.

For this court to allow a blanket legal excuse for a mentally ill person's actions which society has deemed unacceptable, as Mr. Mangus urges, would seriously interfere with the ability of an insurance company to rate risks based upon the policy language and consequently achieve an equitable insurance premium. "If a single insured is allowed, through intentional acts, to consciously control risks covered by the policy, the central concept of insurance is violated." 7A Appleman Insurance Law and Practice (Berdal ed.) § 4492.01.

Accordingly, for the foregoing reasons, we follow the *Johnson* standard denying coverage under a homeowners policy when a mentally ill insured has a minimal degree of understanding of the nature of his act. We will not apply our criminal standard. Therefore, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

Filed April 20, 1994

MILLER, Justice, dissenting:

The majority, in its zeal to protect the insurance carrier, adopted a position that is without precedent. It is anchored only in its idiosyncratic view of insanity.

By far the overwhelming majority of courts that have considered the question of whether an exclusion in a liability policy for acts "expected or intended by the insured" hold that it does not apply if the insured lacks the mental capacity to intentionally commit the act.[1] *Reinking v. Philadelphia Am. Life Ins. Co.,* 910 F.2d 1210 (4th Cir. 1990) (construing Maryland law), *overruled on other grounds, Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017 (4th Cir.1993); *Nationwide Mut. Fire Ins. Co. v. May,* 860 F.2d 219 (6th Cir.1988) (applying Kentucky law); *Rosa v. Liberty Mut. Ins. Co.,* 243 F.Supp. 407 (D.Conn.1965); *Globe Am. Cas. Co. v. Lyons,* 131 Ariz. 337, 641 P.2d 251 (1981); *Clemmer v. Hartford Ins. Co.,* 22 Cal.3d 865, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978); *Mangus v. Western Cas. & Sur. Co.,* 41 Colo.App. 217, 585 P.2d 304 (1978); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Dunkel,* 363 So.2d 190 (Fla.Dist.Ct.App.1978); *Aetna Cas. & Sur. Co. v. Dichtl,* 78 Ill.App.3d 970, 34 Ill.Dec. 759, 398 N.E.2d 582 (1979); *West Am. Ins. Co. of the Ohio Cas. Group of Ins. Cos. v. McGhee,* 530 N.E.2d 110 (Ind.Ct. App.1988); *von Dameck v. St. Paul Fire & Marine Ins. Co.,* 361 So.2d 283 (La.Ct.App.), *cert. denied,* 362 So.2d 794 (La.1978); *Allstate Ins. Co. v. Miller,* 175 Mich.App. 515, 438 N.W.2d 638 (1989); *State Farm Fire & Cas. Co. v. Wicka,* 474 N.W.2d 324 (Minn. 1991); *Ruvolo v. American Cas. Co.,* 39 N.J. 490, 189 A.2d 204 (1963); *Nationwide Mut. Fire Ins. Co. v. Turner,* 29 Ohio App.3d 73, 29 OBR 83, 503 N.E.2d 212 (1986).[2]

In 10 George J. Couch, *Cyclopedia of Insurance Law* § 41:676 (2d ed. 1982), this summary of the majority rule is given:

"In order for an act to be 'intentional' so as to relieve the insurer of liability under a clause so providing in case of intentionally inflicted injuries, it is necessary that the actor inflicting the injury have the mental capacity for the doing of the act 'intentionally.' That is, under policies relieving the insurer from liability for injuries intentionally inflicted, whether fatal or nonfatal, the

---

1. We have recognized the general rule that ordinarily an intentional tort will be excluded under a liability policy that has language confining coverage to acts of the insured that are neither expected or intended. As we stated in Syllabus Point 2 of *Dotts v. Taressa J.A.,* 182 W.Va. 586, 390 S.E.2d 568 (1990):

   "Language in a motor vehicle liability insurance policy defining 'accident' to include 'bodily injury or property damage the insured neither expected or intended' is designed to exclude coverage for an intentional tort such as sexual assault."

See also *Horace Mann Ins. Co. v. Leeber,* 180 W.Va. 375, 376 S.E.2d 581 (1988).

2. The majority claims that there is an "opposing line of authority ... hold[ing] that an injury inflicted by a mentally ill person is 'intentional' where the actor understands the physical nature of the consequences of the act and intends to cause the injury, even though he is incapable of distinguishing between right from wrong." 191 W.Va. at 115, 443 S.E.2d at 457. We do not believe the cases cited can be characterized in this fashion. Most of the cases are shaped by their particular criminal law test for insanity, as we point out *infra.*

insurer is liable, and the exception clause is inoperative, where the person who perpetrated the injury on the insured *was insane to such a degree ... as to be incapable of forming an intention."* (Emphasis added).

*See also* Annot., 33 A.L.R.4th 983 (1984).

As earlier noted, most courts have required a showing that an insured lacked the mental capacity to intentionally have committed the act. The fact that a defendant was found not guilty by reason of insanity of criminal charges for committing the act does not automatically determine whether there is coverage under the insurance policy. In many instances, the discussion of mental incompetency is shaped by the jurisdiction's criminal definition of insanity. Thus, where the *M'Naghten* rule [3] or some variation of it is used, the court may utilize some of its language to fashion its civil rule with regard to an intentional act exclusion under a liability insurance policy.

Typical of this approach is the rather recent opinion of the Minnesota Supreme Court in *State Farm Fire & Casualty Co. v. Wicka, supra.* There, an insured wounded the plaintiff and then killed himself. State Farm sought to defeat coverage under its policy exclusion for intentional torts. At the trial on the policy exclusion issue, the trial court granted summary judgment for State Farm. On appeal, the court noted that its statutory criminal insanity test was analogous to the *M'Naghten* rule.[4] It then decided that the criminal standard should be modified for insurance law purposes by adding loss of ability to control conduct. It then made this summary of its civil insurance rule:

"We hold, therefore, that for the purposes of applying an intentional act exclusion contained in a homeowner's insurance policy, an insured's acts are deemed unintentional where, because of mental illness or defect, the insured does not know the nature or wrongfulness of an act, or where, because of mental illness or defect, the insured is deprived of the ability to control his conduct regardless of any understanding of the nature of the act or its wrongfulness." 474 N.W.2d at 331.

The majority's attempted classification of *Rajspic v. Nationwide Mutual Insurance Co. (Rajspic II)*, 110 Idaho 729, 718 P.2d 1167 (1986), and its earlier counterpart, *Rajspic v. Nationwide Mutual Insurance Co. (Rajspic I)*, 104 Idaho 662, 662 P.2d 534 (1983), is misplaced. Rather, *Rajspic II* begins with the recognition "that, *as a matter of fact,* an intentional tort and an intentional injury exclusion clause cannot be treated synonymously." 110 Idaho at 732, 718 P.2d at 1170. (Emphasis in original).[5] The Idaho Supreme Court went on to observe that when an individual "lacks the mental capacity to conform his behavior to acceptable standards [he] will not be deterred by the existence or nonexistence of insurance coverage for injuries that result as a consequence of his acts." 110 Idaho at 732, 718 P.2d at 1170. (Citations omitted). Finally, the court in *Rajspic II*, on remand, set this rule: "Nationwide must be required to establish that despite Mrs. Rajspic's mental condition, she was still capable of forming the intent to cause injury to Brownson." 110 Idaho at 734, 718 P.2d at 1171.

The New Jersey Supreme Court in *Ruvolo v. American Casualty Co.*, 39 N.J. at 497, 189

---

3. See note 10, *infra*, for a definition of the *M'Naghten* rule.

4. The court in *Wicka* summarized the statutory rule: "Criminal responsibility is excused where the actor, because of mental illness, does not understand the nature of his actions or does not understand that those actions are wrong." 474 N.W.2d at 330. (Citation omitted).

5. The facts and underlying procedure in the two *Rajspic* cases were as follows. Mrs. Rajspic shot and wounded a Mr. Brownson. She was tried for assault with a deadly weapon and was found not guilty by reason of mental disease or defect.

Subsequently, Mr. Brownson brought a civil action against Mrs. Rajspic for assault and battery and was awarded damages. Nationwide defended the civil suit on behalf of Mrs. Rajspic under a policy purchased by the Rajspics. However, it declined to pay the judgment claiming its intentional act exclusion barred coverage. The trial court in *Rajspic I* granted a partial summary judgment against Nationwide. On appeal, the court reversed saying that the capacity of a person with a mental defect to commit an intentional act is a jury question. On remand, the trial court granted summary judgment for Nationwide. This ruling was appealed in *Rajspic II*.

A.2d at 208, after referring to what was basically a *M'Naghten* rule test, quoted from *Life Insurance Co. v. Terry*, 82 U.S. (15 Wall.) 580, 21 L.Ed. 236 (1872), where the United States Supreme Court adopted a similar approach with regard to a life insurance policy which excluded coverage if the insured killed himself.[6] *Ruvolo* involved a liability policy rather than a suicide exclusion under a life insurance policy. The insurance carrier declined to afford coverage when Dr. Ruvolo shot and killed his colleague, whose widow then sued for wrongful death. After the killing, Dr. Ruvolo was found to be insane and was committed to a state mental institution. The New Jersey court adopted this rule for insurance liability for an intentional tort:

"We hold that if the insured was suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason, and while in that condition acting on an irrational impulse he shot and killed Dr. La Face, his act cannot be treated as 'intentional' within the connotation of defendant's insurance contract." 39 N.J. at 498, 189 A.2d at 209.

The rationale behind the majority view is to attempt some conformity with general concepts of insanity under its criminal law.[7] As in this case, where the individual is found to be criminally insane, he does not possess the requisite criminal intent to kill or to maliciously wound. Viewed from the civil side,

under an insurance policy excluding "intentional acts," the insured cannot be said to have acted intentionally, that is, with the requisite mental intent.

Instead of making some rational analysis of this issue, the majority proceeds to embark on its own notions of the meaning of insanity. It seizes on a Kentucky Court of Appeals decision, *Colonial Life & Accident Insurance Co. v. Wagner*, 380 S.W.2d 224, 226 (1964), where the court explains that an intentional killing can be justified if the killing is "in self-defense. A soldier may kill under liberal rules. The executioner may kill with the sanction of the State." However, these justifications have nothing to do with insanity where the lack of mental intent is the critical issue. The majority then pronounces that at some point under its own insanity view, the killing may not have been intentional:

"Indeed, if a person is so delusional that he shoots another human believing him to be a charging elephant, or shoves a knife in another's throat thinking that he is handing him an ice cream cone, then for insurance contract purposes the act is not 'intentional.'" 191 W.Va. at 116, 443 S.E.2d at 458. (Footnote omitted).[8]

The majority then in its single Syllabus utilizes a "minimal awareness" test, which has no reference to mental condition, intention, or any other component of an insanity

6. *Ruvolo*, 39 N.J. at 497, 189 A.2d at 208, quoted this portion from *Terry* and cited additional authorities:

"'If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable.' *Mutual Life Ins. Co. v. Terry*, [82 U.S. (15 Wall.) 580, 591], 21 L.Ed. 236, 242 (1873).
And, *see Connecticut Mutual Life Ins. Co. v. Akens*, 150 U.S. 468, [14 S.Ct. 155,] 37 L.Ed. 1148 (1893); *Charter Oak Life Ins. Co. v. Rodel*, 95 U.S. [(5 Otto)] 232, 24 L.Ed. 433 (1877)."

7. In our jurisdiction, the insanity test is stated in Syllabus Point 5 of *State v. Massey*, 178 W.Va. 427, 359 S.E.2d 865 (1987):

"'When a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law....' Syllabus Point 2, in part, *State v. Myers*, 159 W.Va. 353, 222 S.E.2d 300 (1976)."

8. The majority in its note 2, 191 W.Va. at 116, 443 S.E.2d at 458, cites *State v. Brant*, 162 W.Va. 762, 252 S.E.2d 901 (1979), written by the author of today's majority, dealing with the defense of intoxication. His ruminations about the defense of intoxication never found their way into a syllabus point in *Brant*.

test.[9] It announces that it embraces the standard set in *Johnson v. Insurance Co. of North America*, 232 Va. 340, 350 S.E.2d 616 (1986). However, the majority fails to recognize, as plainly indicated in *Johnson*, that Virginia follows the *M'Naghten* test for insanity in its criminal cases. It is, therefore, understandable that Virginia would use the same test in determining the insanity issue under an insurance liability exclusion that exempts intentional acts.[10] This difference in the criminal insanity test also explains *Pruitt v. Life Insurance Co. of Virginia*, 182 S.C. 396, 189 S.E. 649 (1937),[11] cited by the majority, where the South Carolina Supreme Court applied its criminal insanity test derived from the *M'Naghten* rule to reject a claim under an insurance policy which excluded coverage for death resulting from violence.

However, the majority's Syllabus adopts none of the foregoing tests, but drifts into a nether world where liability is rejected if the insured had a "minimal awareness of the nature of his act." This concept is completely unrooted in either the law of criminal responsibility or psychiatry.

In consequence, I dissent. I am authorized to state that Justice McHUGH joins me in this dissent.

---

**9.** The majority's Syllabus states:

"Coverage under an intentional injury exclusion clause in a homeowners' insurance policy may be denied when one who commits a criminal act has a minimal awareness of the nature of his act. The test for criminal insanity in West Virginia is appropriate only in a criminal trial and has no applicability to the interpretation of plain language in an insurance contract."

**10.** The *M'Naghten* rule was quoted in *Price v. Commonwealth*, 228 Va. 452, 457, 323 S.E.2d 106, 109 (1984), and states, in part:

" '[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.' 10 Cl.

and F. [200,] 210, 8 Eng.Rep. [718,] 722–23 [ (1843) ]."

Under the *M'Naghten* rule, the court in *Price* said that all acts of physical violence are deemed intentional and not relieved by insanity unless this test is met: " 'The defendant was insane if he did not understand the nature, character and consequences of his act, *or* he was unable to distinguish right from wrong.' " 228 Va. at 455, 323 S.E.2d at 107. (*Quoting* the jury instruction offered by the defendant; emphasis in original). In *Price*, the defendant's conviction was reversed because the State's instruction used the conjunction "and." The court in *Price* concluded: "[W]e hold that the actual *M'Naghten* test for insanity, stated in the disjunctive, is the rule in Virginia." 228 Va. at 459, 323 S.E.2d at 110.

**11.** The majority has styled this case *Deloache v. Carolina Life Insurance Co.. Deloache* is found in 233 S.C. 341, 104 S.E.2d 875 (1958), and follows the *Pruitt* principles.