[No. 13997-9-II.   Division Two.   April 22, 1992.]

PUBLIC EMPLOYEES MUTUAL INSURANCE COMPANY,
*Appellant,* v. JAMES F. FITZGERALD, ET AL,
*Respondents.*

*Sidney R. Snyder, Jr.,* and *Merrick, Hofstedt & Lindsey,* for appellant.

*James F. Imperiale* and *Griffin, Imperiale, Bobman & Verhey, P.S.,* for respondents.

*D. Michael Shipley* and *Schweinler, Lowenberg & Lopez,* for guardian ad litem.

PETRICH, C.J. — Public Employees Mutual Insurance Company (PEMCO) appeals from a declaratory judgment finding it liable for bodily injury coverage under a homeowner's policy. PEMCO contends that the insured mother's acquittal by reason of insanity for the death of her child does not preclude a finding that the child's death was "intended and expected" and, therefore, excluded under the insurance policy. We are satisfied that an acquittal in a criminal proceeding by reason of insanity does not preclude an insurer from proving that its insured's conduct falls within an "intentional and expected" exclusion of coverage; that whether an insured was incapable of forming an intent because of mental illness or defect is a factual determination; that the trial court did not err in granting summary judgment because PEMCO failed to raise a material issue of

fact concerning the mother's mental illness; and that the trial court did not err in ordering PEMCO to pay Melinda Fitzgerald's guardian ad litem fees. Accordingly, we affirm.

FACTS

On December 29, 1988, Melinda Fitzgerald killed her 2½-year-old son by choking and drowning him. After her arrest, she made a statement to the police detailing the events that had occurred.[1] The State charged her with first degree murder. After a waiver of her right to a jury trial, the court acquitted her, finding her not guilty by reason of insanity.

James Fitzgerald, Melinda Fitzgerald's husband, made a claim to PEMCO for liability coverage for their son's death. PEMCO filed this action for a declaratory judgment to decide whether it was liable to cover the damages resulting from the child's death. James Fitzgerald then moved the

---

[1]During an interview with Melinda Fitzgerald at the police station, Detective Norton asked her what happened. She replied, "Why I just thought I wanted to kill him because he was suffering, because I'm not a very good mom, I was not a good mom." Later during the interview, Melinda Fitzgerald recounted the events:

I just wanted to get it over with. He [Jamie] woke up about a quarter to eight this morning. I read him a few books. I didn't feed him because he doesn't eat until 9:30 or quarter to ten. I was on the couch and he [Jamie] was dressed. I had blue overalls on him. We were going to go bye-bye and I was going to wreck the car just to kill both of us. I didn't want . . . He was sitting on my lap on the couch. Then I decided to get the cord and strangle him. . . . I got the cord before I sat down. I knew I was going to use the cord before I sat down on the couch. We were sitting on the couch. His head was facing outwards. . . . Then I just put it [the cord] around his [Jamie] neck and strangled him for about fifteen minutes. He struggled a little bit at first then it seemed he went unconscious. He kicked his feet and arms and struggled. He was starting to choke, but I just held the cord. Then he was choking for about five minutes, I think. I don't know when he passed out. Then he tried to breathe, but I held the cord around his neck, then I held it there for fifteen twenty minutes, but there was still a faint heart beat. I didn't want him to suffer so I went to drown him. . . . I took him into the bathtub, I sat him on the floor, there was no water in the tub. I layed him on his back . . . I put some water in the bathtub and put him in with his clothes on and then I drowned him by turning his head to one side and pushing on his chest, and then I took his overalls off and left him in the bathroom. I took him out and I took his soak and wet diapers off and put on dry ones. I left him in the bathroom on the floormat. Then I called the police.

court for the appointment of a guardian ad litem for his wife and asked the court to impose the costs of this appointment on PEMCO. PEMCO did not oppose the appointment of a guardian ad litem, but it did oppose its responsibility for the costs. PEMCO then moved for summary judgment. The court entered a summary judgment order holding PEMCO liable for claims arising out of the child's death. Subsequently, the court ordered PEMCO to pay the costs of the guardian ad litem.

Section II of the homeowner's policy governs the Fitzgeralds' claim. Part E of that section, which governs personal liability coverage, provides:

**Coverage E — Personal Liability**
If a claim is made or a suit is brought against any **insured** for damages because of **bodily injury** or **property damage** to which this coverage applies, we will:
    a. pay up to our limit of liability for the damages for which the **insured** is legally liable; and
    b. provide a defense at our expense by counsel of our choice. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for damages resulting from the occurrence equals our limit of liability.

Under section II of the policy governing exclusions, the policy provides:

    1. **Coverage E — Personal Liability** . . . do[es] not apply to **bodily injury** or **property damage:**
    a. which is expected or intended by the **insured;**

The policy defines "bodily injury":

    1. **"bodily injury"** means bodily harm, sickness or disease, including required care, loss of services and death resulting therefrom.

STANDARD OF REVIEW

■ This court engages in the same inquiry as the trial court on appeal from summary judgment. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to prevail as

a matter of law. *Wilson,* at 437. The interpretation of the language in an insurance policy is a question of law subject to de novo review. *Roller v. Stonewall Ins. Co.,* 115 Wn.2d 679, 682, 801 P.2d 207 (1990). Exclusionary clauses in insurance policies are strictly construed against the insurer. *Rodriguez v. Williams,* 107 Wn.2d 381, 386, 729 P.2d 627 (1986).

### EXCLUSION FOR INTENTIONAL ACTS

The traditional rule has been that when a slayer is insane at the time of his or her act, the "intended or expected" exclusion to a liability policy is ineffective, even though the policy would have excluded recovery had the slayer been sane at the time of the act. 4 G. Couch, *Insurance* § 27:155 (2d ed. 1984); 10 G. Couch, *Insurance* § 41:696 (2d ed. 1982). The purpose for this rule is as follows:

> [T]o deny coverage for acts caused by an individual lacking the mental capacity to act rationally is inconsistent with a primary purpose for incorporating intentional injury exclusions into insurance policies, *i.e.,* to preclude individuals from benefiting financially when they deliberately cause injury. An individual who lacks the capacity to conform his behavior to acceptable standards will not be deterred by the existence or nonexistence of insurance coverage for the consequences of his acts.

*Globe Am. Cas. Co. v. Lyons,* 131 Ariz. 337, 339-40, 641 P.2d 251, 253-54 (Ct. App. 1981) (citing *Congregation of Rodef Sholom v. American Motorists Ins. Co.,* 91 Cal. App. 3d 690, 154 Cal. Rptr. 348 (1979)).

There are emerging views, however, that differ from this traditional rule. One such view is that "intentional" under an insurance clause is an issue of fact different from that at issue in criminal proceedings. PEMCO urges this viewpoint and one which would exclude coverage upon proof that the insured understood the nature of his or her act but could not distinguish right from wrong. *See generally* Annot., *Liability Insurance: Intoxication or Other Mental Incapacity Avoiding Application of Clause in Liability Policy Specifically Exempting Coverage of Injury or Damage Caused*

*Intentionally by or at Direction of Insured*, 33 A.L.R.4th 983, § 2, at 987 (1984).

The question presented is one of first impression in Washington. PEMCO urges this court to apply the reasoning of the Washington Supreme Court in *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 776 P.2d 123 (1989). We find that case inapplicable to the facts at hand. *Brosseau* follows an emerging trend of cases finding that self-defense, while an excuse in a criminal proceeding, does not make an otherwise intentional act unintentional. In *Brosseau*, Grange Insurance initiated a declaratory judgment to determine if it had a duty to defend its insured in a wrongful death action. The insured asserted that he had acted in self-defense and, hence, the result of his act was not "intended or expected". The court assumed for the sake of argument that the insured had acted in self-defense, noting that the actual determination was an unresolved question of fact. *Brosseau*, at 95. The court looked to the insured's own words to determine as a matter of law that the insured's act was deliberate. "Brosseau's statement establishes that he pumped the shotgun, aimed it at Anderson, and pulled the trigger. Brosseau's own words confirm that he deliberately fired the shotgun at Anderson. The fact that he claims to have done so in self-defense in no way negates the deliberate nature of his act." *Brosseau*, at 96. The court rejected the reasoning of the Ohio Supreme Court, which held in *Preferred Mut. Ins. Co. v. Thompson*, 23 Ohio St. 3d 78, 491 N.E.2d 688 (1986), that there is no deterrent rationale in cases of self-defense and therefore, the exclusion should not apply. The *Brosseau* court said that such reasoning is sound when discussing public policy, but does not apply to a contractual interpretation. The court said, "we do not accept the principle that because intentional acts are excluded in order to avoid control of the risks by the insured, acts of self-defense are included because the insured does not control the risks. Simply because a risk is calculable does not mean it is covered." *Brosseau*, at 98.

PEMCO urges us to examine statements Melinda Fitzgerald made to the police to determine as a matter of law that she intended or expected her acts to end her child's life. *Brosseau* does not compel us to do so. "In *Brosseau*, there was no issue of fact as to the insured's intent to shoot the victim, but only whether the reason for the shooting made the exclusionary language inapplicable." *Safeco Ins. Co. of Am. v. McGrath*, 63 Wn. App. 170, 174, 817 P.2d 861 (1991), *review denied*, 118 Wn.2d 1010 (1992). One asserting self-defense has the capacity to intend the consequences of his or her act. One suffering from mental illness or defect does not necessarily have that requisite capacity. *See U.S.F.&G. Ins. Co. v. Brannan*, 22 Wn. App. 341, 349, 589 P.2d 817 (1979) (jury instruction proper when providing that for an act to be "intended", the insured must have the "mental capacity to form the requisite intent to commit the act"); *New York Underwriters Ins. Co. v. Doty*, 58 Wn. App. 546, 794 P.2d 521 (1990) (absent proof of insanity, insured is presumed to be sane and able to form the general intent to commit the acts in question).

Other jurisdictions have dealt with the issue presented in differing contexts. The following cases arose on summary judgment: *Allstate Ins. Co. v. Miller*, 175 Mich. App. 515, 438 N.W.2d 638 (1989) (court agreed with majority line of cases that if a person is insane, he cannot act intentionally and held that summary judgment denying coverage was inappropriate because insureds presented evidence that slayer was unaware of what he was doing or was unable to control his actions); *Rajspic v. Nationwide Mut. Ins. Co.*, 110 Idaho 729, 718 P.2d 1167 (1986) (citing cases that held *as a matter of law* that injuries at the hand of an insured insane person are not excluded from insurance coverage, the court nevertheless held that whether the insured, who was acquitted of criminal charges of assault by reason of insanity and later found civilly liable for the intentional assault, intentionally caused the injury so as to qualify under the exclusionary clause was a question of fact and that the earlier civil proceeding which determined that the

insured was liable for the intentional assault does not give rise to collateral estoppel so as to dispose of the issue by summary judgment); *Nationwide Mut. Fire Ins. Co. v. Turner*, 29 Ohio App. 3d 73, 503 N.E.2d 212 (1986) (insane individual cannot commit an intentional act within meaning of intentional injury exclusion clause, and summary judgment is inappropriate because insanity is issue of fact); *George v. Stone*, 260 So. 2d 259 (Fla. Dist. Ct. App. 1972) (insane person cannot perform intentional act; summary judgment in favor of insurer was inappropriate because insanity is question of material fact); *Ruvolo v. American Cas. Co.*, 39 N.J. 490, 189 A.2d 204 (1963) (if insured is insane at time of act and excused from criminal responsibility, killing should not be considered intentional under the insured's policy; however, summary judgment inappropriate when plaintiff's evidence is insufficient to dispel uncertainty about insured's mental state).

The following cases arose in contexts other than summary judgment: *Transamerica Ins. Corp. of Am. v. Boughton*, 177 Mich. App. 253, 440 N.W.2d 922 (1989) (finding that insured is not guilty by reason of insanity does not preclude the insurer from proving at trial that the insured's conduct falls within an "intentional and expected" acts exclusion in a homeowner's policy because the failure of the prosecutor to prove sanity beyond a reasonable doubt is different from the ability to prove by a preponderance of the evidence that the insured intended and expected injury); *Johnson v. Insurance Co. of North Am.*, 232 Va. 340, 346, 350 S.E.2d 616 (1986) (insured acquitted by reason of insanity, yet held civilly liable because he "understood the physical nature and consequences of his conduct, and had the purpose and volition to cause the injury, although he was mentally incapable of distinguishing between right and wrong."); *Globe Am. Cas. Co. v. Lyons*, 131 Ariz. 337, 641 P.2d 251 (Ct. App. 1981) (rejected *M'Naghten* test in favor of test of whether insured was suffering from a mental derangement making it impossible for her to act in accordance with reason; reversed trial

court's judgment in favor of insurer because there was substantial evidence of insured's mental derangement).[2]

In *State Farm Fire & Cas. Co. v. Wicka*, 474 N.W.2d 324 (Minn. 1991), the Minnesota Supreme Court criticized those cases holding that a finding of criminal insanity precludes litigation under the insurance policies as a matter of law and those cases focusing on the question of whether the assailant knew what he or she was doing but did not distinguish right from wrong. The court said:

> As our cases show, an intent to cause bodily injury requires that the insured possess both cognitive and volitional capacities, either of which may be affected by an insured's mental illness. We hold, therefore, that for the purposes of applying an intentional act exclusion contained in a homeowner's insurance policy, an insured's acts are deemed unintentional where, because of mental illness or defect, the insured does not know the nature or wrongfulness of an act, or where, because of mental illness or defect, the insured is deprived of the ability to control his conduct regardless of any understanding of the nature of the act or its wrongfulness.

*Wicka*, at 331. In discussing the public policy issues, the court said:

> The purpose of the intentional act exclusion is to deny the insured a license to commit wanton and malicious acts. Both insurer and insured expect coverage will lie for unintentional injuries caused by the insured, regardless of the insured's mental condition. Given these expectations, we see no discernable difference between injuries caused by a mentally ill insured, who lacks the ability to formulate an intent to injure, and the insured who acts out of reflex or self-defense. Nor do we believe any financial disincentive would sway those persons who, because of mental illness, lack the capacity to conform conduct to the law. . . . Unlike intoxication, mental illness is hardly voluntary and not laden with the potential for abuse or fraud.

(Citation omitted.) *Wicka*, at 331.

■ ■ We agree with this reasoning and hold that the question of whether a person was incapable of forming an

---

[2]The court noted that even if it applied the *M'Naghten* test, the evidence supports a finding of insanity because, while she understood the quality of her act, she was unable to distinguish right from wrong. *Globe Am. Cas. Co. v. Lyons*, 131 Ariz. 337, 343 n.2, 641 P.2d 251, 257 n.2 (Ct. App. 1981).

intent because of mental disease or defect is one of fact. *See also Safeco Ins. Co. of Am. v. McGrath, supra* (intent to injure is a question of fact precluding summary judgment). Further, because it arises in a different context in civil actions than in a criminal action, an adjudication of criminal insanity should not preclude a contrary finding in a related civil action. The issue in the first adjudication was whether Fitzgerald was criminally insane at the time of her act, not whether the death of her son was an "intended or expected" result of her actions.[3] The first question asked when deciding if collateral estoppel applies is whether the issue decided in the prior adjudication is identical with the one presented in the action in question. *McDaniels v. Carlson*, 108 Wn.2d 299, 303, 738 P.2d 254 (1987). Because any mental disease or defect could preclude the formation of an intentional act, even though the proof of which may not amount to criminal insanity, the two adjudications present different issues.

### Summary Judgment

■ PEMCO contends that this court should, at the least, remand this case because a material issue of fact exists about whether Melinda Fitzgerald "intended or expected" to cause her child's death. However, PEMCO fails to controvert the affidavits of the only three experts provided. Brett C. Trowbridge, Ph.D., J.D., licensed psychologist, stated:

> In my opinion, at the time of the death of Jamie she was grossly psychotic. She had great difficulty determining right from wrong, and certainly could not appreciate the nature and quality of her conduct. Furthermore, in my opinion she fits under the insanity rule enunciated in State v. Cameron, 100 Wn.2d, 520, (1983), which provides that a person was insane if she committed a homicide because of command hallucinations from a deity.

---

[3]By analogy, the intention to inflict injury can be inferred as a matter of law in nonconsensual sex act cases when determining liability coverage under the "expected or intended" exclusion. The minority view is that intent must be proven. *See* 7A J. Appleman, *Insurance* § 4501.09, at 72 (Supp. 1979); *Rodriguez v. Williams*, 107 Wn.2d at 387 (subjective determination of intent does not apply in cases of incest: harm is intended as a matter of law); *Grange Ins. Ass'n v. Authier*, 45 Wn. App. 383, 386, 725 P.2d 642 (1986), *review denied*, 107 Wn.2d 1024 (1987) (intent inferred as matter of law when indecent liberties).

Michael Morrison, Ph.D., licensed psychologist, stated:

With regard to the issue of legal sanity at the time of the alleged offense, an extensive base of information strongly suggests that Mrs. Fitzgerald was unable to appreciate the nature and quality of her actions. Records of previous hospitalizations document a history of experiencing command hallucinations and delusions. The attempt to stab her husband in the throat with a knife less than two months previously, and the description of her behaviors in the hospital subsequent to that attack, demonstrate that the magnitude of her psychotic symptoms is not easily detected by those around her. The description of her behaviors and statement provided bt [sic] the police reports demonstrate illogical reasoning and impaired judgement consistent with her claim of experiencing command hallucinations and affect consistent with her failing to appreciate the quality of her act. Information provided by Mrs. Fitzgerald's mother, father, and neighbors was consistent with Mrs. Fitzgerald having a psychotic disorder that substantially interfered with, and at times precluded, appreciating both the nature and quality of her actions. In my opinion, Mrs. Fitzgerald was legally insane at the time of the alleged offense.

Thomas L. Corlew, M.D., staff psychiatrist, stated:

I have reviewed Dr. Morrison's January 23, 1989 report to the court. His presentation of the case is consistent with my understanding of it and I concur with his conclusions. More specifically, it is my opinion that Ms. Fitzgerald is suffering from schizophrenia and dysthymic disorder, and that her mental illness so impaired her ability to perceive the quality of her actions at the time of the alleged criminal offense that she was legally insane.

PEMCO urges that Melinda Fitzgerald's statements to the police that she wanted her son to die raise a material issue of fact about her ability to understand the nature and consequences of her acts.[4] We disagree. First, PEMCO has failed to provide any statements other than Melinda Fitzgerald's to support its contention that she understood the nature and consequences of her acts. The experts unanimously concur that she did not. Second, the experts explain the consistency between the police descriptions of Melinda Fitzgerald's behavior and her mental illness. Finally, the

---

[4]PEMCO conceded at oral argument that if Melinda Fitzgerald were incapable of understanding the nature and consequences of her act, the result of her act would not be "intended or expected" as used in its insurance policy.

experts provide explanations for why she denied that she acted under the influence of command hallucinations and delusions. By failing to controvert these explanations, PEMCO fails to raise a material issue of fact about whether Melinda Fitzgerald was able to perceive the nature and quality of her act. That being the case, the only reasonable inference from these affidavits is that she was incapable of intending or expecting the result of her acts.

### GUARDIAN AD LITEM EXPENSES

PEMCO contends that the trial court improperly imposed upon it the costs of Fitzgerald's guardian ad litem. PEMCO argues that it had no duty under either its duty to defend clause or under its reimbursement clause of the liability policy. The duty to defend clause obligated PEMCO to defend certain lawsuits seeking to impose liability on the insured. PEMCO contends that this is not such a lawsuit. The duty to reimburse clause of the policy obligated PEMCO to pay reasonable costs incurred in helping PEMCO in the investigation or defense of a claim against its insured. PEMCO contends that this coverage does not extend to litigation brought solely to determine the extent of coverage under the policy.

PEMCO relies upon the case of *Farmers Ins. Co. v. Rees*, 96 Wn.2d 679, 638 P.2d 580 (1982). That case, which held that the insurer was not obligated to pay the insured's attorney fees in an action for a declaratory judgment when the sole issue was the extent of coverage, has been expressly overruled by the Supreme Court in *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991). In that decision, the court said:

> Whether the insured must defend a suit filed by third parties, appear in a declaratory action, or as in this case, file a suit for damages to obtain the benefit of its insurance contract is irrelevant. In every case, the conduct of the insurer imposes upon the insured the cost of compelling the insurer to honor its commitment and, thus, is equally burdensome to the insured. . . .
> . . . Upon reconsideration, however, we believe that an award of fees is required in any legal action where the insurer

compels the insured to assume the burden of legal action, to obtain full benefit of his insurance contract, regardless of whether the insurer's duty to defend is at issue. We thus overrule *Farmers* to the extent that it is inconsistent with our holding today.

(Footnote and citations omitted.) *Olympic S.S.*, at 52-53. Under this same reasoning, the order of the trial court was proper. PEMCO must pay the fees and costs of the guardian ad litem.

Judgment affirmed.

ALEXANDER and MORGAN, JJ., concur.