[No. 22414-3-II. Division Two. January 8, 1999.]

ALLSTATE INSURANCE COMPANY, *Respondent*, v. MARTIN E. RAYNOR, *Individually and as Personal Representative*, ET AL., *Appellants*.

*Thomas M. Geisness*; and *Michael R. McKinstry* of *Ellis, Li & McKinstry, P.L.L.C.*, for appellants.

*R. Daniel Lindahl* and *Douglas F. Foley* of *Bullivant Houser Bailey, P.C.*, for respondent.

HUNT, J. — Martin E. Raynor, and David Johnson,[1] appeal a summary judgment in favor of Allstate Insurance

---

[1]Martin E. Raynor appeals individually, as guardian of Kathryn Raynor, and on behalf of the estate of Cheryl Raynor. David Johnson appeals individually and on behalf of the estate of Candy Johnson. For purposes of this opinion we refer to both collectively as "Raynor."

Company. The trial court ruled that Margie and Milton King's homeowners policy did not cover Milton King's criminal acts of shooting to death Martin Raynor's ex-wife and daughter. Raynor argues that: (1) Allstate's policy exclusions for criminal or intentional acts do not apply where the insured lacked the mental capacity to form the requisite intent, about which there is a material issue of fact; (2) the "criminal acts" exclusion does not apply where the insured has been neither convicted of, nor charged with, a crime arising from the incident for which coverage is sought; (3) a material issue of fact remains as to whether Margie King's negligence was the "efficient proximate cause" of the deaths of Martin Raynor's ex-wife and daughter; (4) the trial court improperly denied coverage to Margie King based on the policy's "joint obligations" clause; and (5) the "joint obligations" clause violates public policy. Allstate responds that multiple provisions of the policy preclude coverage because the homicides were intentional, not accidental.

Holding that: (1) the Kings' homeowners insurance policy does not cover Milton's "intentional" and "criminal" acts; (2) Milton's shooting of his neighbors was not an "accident"; (3) the "joint obligations" clause would deny Margie coverage even if her actions had been a proximate cause of the shootings; and (4) the "joint obligations" clause is not void, we affirm.

## FACTS

David and Candy Johnson and Candy's two daughters, Cheryl and Kathryn Raynor, lived in Longview next door to Milton and Margie King.[2] Milton King was a troubled man with a history of violence. In November 1990, he was arrested and convicted for assaulting his wife, Longview police officers, and others with a .22 caliber handgun, which

---

[2]"The court meaning no disrespect, but for the sake of simplicity and clarity, identifies the parties using their first names." *In re Marriage of Monaghan*, 78 Wn. App. 918, 920 n.1, 899 P.2d 841 (1995).

police confiscated. A week after being sentenced, Milton asked his attorney to retrieve his gun from police.

By July 2, 1992, Milton had completed all conditions of his sentence. He went to his attorney's office and requested his handgun. His attorney refused and instead gave it to Margie. The attorney warned that, as a convicted felon, Milton was not permitted to possess guns, and he advised Margie not to take the gun into the Kings' home. Despite this warning, Margie returned the gun to Milton.

On the morning of July 10, 1992, Milton complained to Longview police that the Johnsons had been "illegally" keeping rabbits and dumping rabbit excrement near a fence between their properties. Later that day, Candy Johnson, her daughters, and the girls' friend Shannon Connors were stacking wood on the Johnsons' side of the fence. Milton and Margie began cursing over the fence at Candy and the children. Candy called Cowlitz County Communications (911).

City of Longview Police Officer Casey Tilton stopped at the Johnson home, examined the woodpile, and assured Candy that she had the right to stack wood by the fence. He also spoke with the Kings, who renewed their complaint regarding the rabbits and the woodpile. Officer Tilton noted that Milton was "acting real strange, 10-22, the whole works."[3]

When Candy and the children resumed stacking wood near the fence, Margie called the Cowlitz County Communications center. The operator contacted the police department, which informed her that Officer Tilton had been on the scene earlier. As instructed, she told Margie that this was a civil matter and that the police would not be taking action. Margie was upset, despite the operator's attempts to calm her.

The operator next received a call from a woman named "Mary," who reported that she knew Milton and thought

---

[3] "10-22" is apparently the police designation for someone who is acting crazy or demonstrating signs of a mental disturbance.

that officers "should at least go . . . talk to him because this man is going to do something very violent one of these days. Very violent." Apparently, Milton had tried to contact Mary earlier that day. Having known him for some time, she opined to the 911 operator that "he does not care. He wouldn't care if the officers killed him." The 911 operator agreed, "Well, that's obvious."

After ending her conversation with the operator, Margie informed Milton that the police would not be responding. This made him even angrier than he had been before. Margie went back outside, had more words with Candy and the children, apparently stuck a stick through a gap in the fence in an attempt to knock down the Johnsons' wood pile, then went back inside her home. Moments later Margie observed Milton in the Kings' yard, armed with the .22 caliber handgun and a .38 caliber revolver.[4] He was standing behind the fence watching, through a gap in the fence, Candy and the children stacking wood.

Believing that Milton might harm the family, Margie told him not to do anything because "it wasn't worth it." Milton came back into the house, put the guns in a drawer in his bedroom, and lay down on the bed. Margie went back into the yard and turned on a sprinkler, which sprayed water over the fence onto the children. The children called Margie a name and Margie turned down the water. Minutes later, Margie heard some "pops," went inside, and noticed that Milton was no longer in the house.

Milton had entered the Johnson property and started shooting. He shot Cheryl, aged 12, twice in the chest; he shot Candy once in the mouth. Cheryl collapsed onto a lawn chair. Shannon Connors fled to her home across the street. Kathryn, aged 11, and Candy ran into the Johnson house, where Candy called 911. Because she had been shot in the mouth, Candy had trouble speaking. The operator could understand only that Candy had been shot at "2950"; she could not understand the street name. The operator

---

[4] It is unclear from the record which gun Milton actually used when he began shooting, or whether he used both.

heard a high-pitched scream and gunshots in the background as Milton shot Candy twice more in the chest. The operator advised police that shots had been fired at "2950" but did not yet know the street name. Officer Tilton suggested that it might be "2915 Fir," which he believed to be the Kings' address based on previous dealings with Milton involving firearms.[5] Tilton immediately headed for 2915 Fir; en route, he received confirmation that Fir was the correct street.

Meanwhile, Candy and Kathryn fled to the bathroom, with Milton in pursuit. Candy wedged her body against the door in an effort to keep Milton out. Kathryn hid in the bathtub and watched her mother die. Unable to enter the bathroom, Milton left the Johnson house and shot himself in the head. Officers found Candy and Milton dead and Cheryl bleeding in the front yard; she died later that day.

Martin Raynor, as the personal representative of the Estate of Cheryl Raynor and as Guardian Ad Litem of Kathryn Raynor, and David Johnson, as personal representative of the Estate of Candy Johnson, filed an action for wrongful death and personal injuries in the U.S. District Court for the Western District of Washington. They named as defendants: the Kings (Milton's estate and Margie), alleging negligence; and the City of Longview, Officers Tilton and Homad individually, and Cowlitz County, alleging violations of 42 U.S.C. § 1983.[6]

As provider of the Kings' homeowners policy, Allstate brought a declaratory judgment action in Cowlitz County Superior Court, seeking to avoid liability for the deaths of Candy and Cheryl. Allstate alleged that the deaths and injuries had been caused by Milton King's intentional and criminal acts, not by either of the Kings' negligence, and

---

[5]In reality, the Kings' address was 2909 Fir Street, and 2915 Fir was Candy's address.

[6]Martin and David's 42 U.S.C. § 1983 claims were dismissed by the District Court; the dismissal was upheld on appeal. They subsequently filed an action in Clark County Superior Court alleging the negligence of Milton and Margie and the other defendants named in the earlier suit.

the that Kings' policy did not provide coverage for Milton's "intentional" and "criminal" acts.[7] The trial court granted summary judgment to Allstate as to liability for the actions of both Milton and Margie. Martin Raynor and David Johnson appealed.

## ANALYSIS
## I. STANDARD OF REVIEW

On appeal from summary judgment, we engage in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is proper only if there are no genuine issues of material fact and the moving party is entitled to prevail as a matter of law. *Public Employees Mut. Ins. Co. v. Fitzgerald*, 65 Wn. App. 307, 310-11, 828 P.2d 63 (1992). The burden is on the moving party to show that there is no genuine issue of material fact. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 395, 823 P.2d 499 (1992). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996). Summary judgment should be

---

[7]Allstate brought four summary judgment motions: (1) On December 6, 1994, Allstate moved for summary judgment against all defendants claiming that there were no facts to support coverage of the Kings under their homeowners policy because the deaths of Candy and Cheryl were not the result of an "accident," or were the result of Milton's "intentional acts." The trial court granted additional time to defendants to provide supplemental information to the court. After supplementation, the earlier motion for summary judgment was apparently never renoted and was therefore never ruled upon. (2) On November 7, 1995, Allstate again moved for summary judgment, arguing that no coverage existed for the Kings because Milton's acts constituted intentional misconduct, and defendants did not assert a separate cognizable claim against Margie. Allstate's motion was denied by memorandum opinion dated January 29, 1996. (3) On November 26, 1996, Allstate filed a third motion for summary judgment, arguing that the Kings' homeowners policy and its "intentional or criminal acts" exclusion operated to deny coverage to the Kings. The trial court granted Allstate summary judgment as to Milton, without specifying its reasons for the decision, and denied the motion as to Margie. (4) On July 11, 1997, Allstate filed its fourth motion for summary judgment, arguing the that the "intentional or criminal acts" exclusion and the "joint obligations" clause in the King's homeowners policy operated to deny coverage to Margie. The trial court granted Allstate's motion without specifying its reasons.

granted only if, from all of the evidence before the court, reasonable persons could reach but one conclusion. *See Detweiler v. J.C. Penney Cas. Ins. Co.*, 110 Wn.2d 99, 108-09, 751 P.2d 282 (1988).

■ ■ "The interpretation of the language in an insurance policy is a question of law subject to de novo review." *Fitzgerald*, 65 Wn. App. at 311. Exclusionary clauses contained in insurance policies are strictly construed against the insurer. *Id.*

## II. POLICY EXCLUSION FOR INTENTIONAL OR CRIMINAL ACTS

The Kings' Allstate homeowners insurance policy clearly states that it does not cover

> any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person.

■ Raynor argues that Milton King's mental disturbance, falling short of criminal insanity, was such that the shootings cannot be termed "intentional or criminal acts" for purposes of the policy's exclusion. We have previously held that the "question of whether a person was incapable of forming an intent because of mental disease or defect is one of fact." *Fitzgerald*, 65 Wn. App. at 315-16. Similarly, Division One has ruled that: (1) the existence or absence of intent to injure is a question of fact precluding summary judgment, *Safeco Ins. Co. v. McGrath*, 63 Wn. App. 170, 174, 817 P.2d 861 (1991); but also (2) as a matter of law, intent to harm can be inferred from an insured's actions in physically attacking a third party. *New York Underwriters Ins. Co. v. Doty*, 58 Wn. App. 546, 553, 794 P.2d 521 (1990). The rationale behind *Doty* is that "where the act is indissolubly bound with the injury, the law imputes the intent to injure to the insured, and the exclusion applies."

*McGrath*, 63 Wn. App. at 173. Such are the facts and legal imputation here.

## A. Insanity

■ The traditional rule has been that when a slayer is insane at the time of his or her act, a liability policy's "intended or expected" exclusion is ineffective; this is so, even where the policy would have precluded recovery had the slayer been sane. 4 GEORGE J. COUCH, COUCH CYCLOPEDIA OF INSURANCE LAW § 27:156 (Ronald A. Anderson & Mark S. Rhodes 2d rev. ed. 1984); 10 COUCH, *supra* § 41.696 (1982).

> [T]o deny coverage for acts caused by an individual lacking the mental capacity to act rationally is inconsistent with a primary purpose for incorporating intentional injury exclusions into insurance policies, *i.e.*, to *preclude individuals from benefiting financially when they deliberately cause injury*. An individual who lacks the capacity to conform his behavior to acceptable standards will not be deterred by the existence or nonexistence of insurance coverage for the consequences of his acts.

*Fitzgerald*, 65 Wn. App. at 311 (citations omitted) (emphasis added).

If an insured "was not insane at the time he committed the offenses, [he] is presumed to be sane and able to form the general intent to commit the acts in question." *Doty*, 58 Wn. App. at 551. There is no evidence that Milton was criminally insane when he shot Candy and Cheryl.

To establish the defense of insanity, it must be shown that:

> (1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:

> (a) He was unable to perceive the nature and quality of the act with which he is charged; or

> (b) He was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010(1), the statutory codification of the *M'Naghten*[8] test. *Doty,* 58 Wn. App. at 551.

Criminal insanity is an affirmative defense that an accused must establish by a preponderance of the evidence. *State v. Wicks,* 98 Wn.2d 620, 621-22, 657 P.2d 781 (1983). The test for criminal insanity is "very rigorous." *State v. McDonald,* 89 Wn.2d 256, 272, 571 P.2d 930 (1977), *overruled on other grounds by State v. Sommerville,* 111 Wn.2d 524, 760 P.2d 932 (1988).

The criminal insanity defense "is not available to all who are mentally deficient or deranged[.]" *State v. Crenshaw,* 98 Wn.2d 789, 793, 659 P.2d 488 (1983). "Many, if not most, mentally ill persons presently being treated [in Washington] . . . would not meet the *M'Naghten* test[.]" *McDonald,* 89 Wn.2d at 273 (alteration in original). The defense "is available only to those persons who have lost contact with reality so completely that they are beyond any of the influences of the criminal law." *State v. White,* 60 Wn.2d 551, 590, 374 P.2d 942 (1962).

Here, there is no evidence that Milton met either of the tests of RCW 9A.12.010(1). Raynor's expert witness, Dr. G. Christian Harris, indicated that he "would not go so far as to say that [Milton] didn't understand the general nature of his acts" and that he saw "nothing in the record to indicate that [Milton] wouldn't have a basic idea of what was right and what was wrong." Furthermore, there was no evidence in the record "that suggested delusional thinking, hallucinatory deficits that would ordinarily be necessary to sustain a feeling that the person was disturbed to the extent that he couldn't understand the wrongfulness of his actions" or that Milton suffered from "a psychotic illness that would remove him from understanding the nature of his act or its wrongfulness."

Lacking evidence that Milton was criminally insane when he shot and killed Candy and Cheryl, Raynor cannot avoid,

---

[8]*See M'Naghten's Case,* 10 Clark & Fin. 200, 8 Eng. Rep. 718 (H.L. 1843).

on grounds of insanity, the insurance policy's exclusion of coverage for his intentional or criminal acts.[9]

## B. Lack of Criminal Conviction

The Kings' homeowners policy provides that Allstate does not cover "bodily injury . . . which may reasonably be expected to result from the . . . criminal acts of an insured person[.]" Raynor argues that this "criminal acts" exclusion applies only where a criminal conviction has been obtained against the insured for the acts giving rise to the claim of liability. Raynor further argues that the definition of "criminal acts" under the Kings' homeowners policy is ambiguous because other Allstate policies expressly exclude coverage for: (1) "criminal acts" not resulting in criminal charges or convictions and (2) acts committed while the insured lacked the capacity to form the intent to commit the act. But language included in an insurance policy other than the one Allstate issued to the Kings has no relevance because the Kings' policy is clear on its face.

■ ■ Allstate counters that the "criminal acts" exclusion unambiguously absolves Allstate from all liability for any actions that can be construed as criminal under any statute. While we do not subscribe to such a broad statement, we agree that coverage for Milton's acts is precluded. Milton's actions clearly violated criminal statutes, and the average purchaser of insurance would understand such actions to be excluded criminal acts. *Accord 20th Century Ins. Co. v. Stewart*, 63 Cal. App. 4th 1333, 1338, 74 Cal. Rptr. 2d 492 (1998) (where the crime committed is a felony, rather than a misdemeanor or infraction, a "criminal acts" exclusion unambiguously excludes coverage for an injury which is a foreseeable result of the criminal act).

The trial court relied on *Allstate Ins. Co. v. Peasley*, 131

---

[9]Because we hold that Milton's actions in shooting his neighbors constituted intentional, criminal acts for purposes of the insurance policy's exclusionary clause, we need not address Raynor's argument that diminished capacity, short of criminal insanity, will also work to prevent the "intentional or criminal acts" exclusion from applying.

Wn.2d 420, 932 P.2d 1244 (1997), in dismissing the claims against Milton. But *Peasley* simply dealt with whether a "criminal acts" clause differentiated between intentional and unintentional criminal acts. *Peasley* did not address the issue of whether a criminal conviction is necessary in order for the "criminal acts" exclusion to apply. But we can affirm on any grounds supported by the record, including those not explicitly considered by the trial court. *See, e.g., State v. Norlin,* 134 Wn.2d 570, 582, 951 P.2d 1131 (1998). Accordingly, we hold that neither a criminal charge nor a conviction is prerequisite to operation of the policy's exclusion of coverage for criminal acts. It is enough for this case that, as a matter of law, Milton's actions were clearly "criminal" by any measure.[10] We affirm the trial court on these grounds.

## III. EFFECT OF "ACCIDENTAL LOSS" LIMITATION

Allstate argues that, even if the "intentional or criminal acts" exclusion does not apply, coverage is still lacking because the Kings' homeowners policy covers only "accidental loss" and this was clearly not an accidental loss. Raynor replies that: (1) this argument is not properly before this court because it was raised at the trial court level and rejected; (2) Allstate did not cross-appeal the rejection of its "accident" argument; and (3) the acts are presumed accidental, unless Allstate can show that they were deliberate. *See* RAP 2.4, 2.5; *Carrick v. Locke,* 125 Wn.2d 129, 140, 882 P.2d 173 (1994). While it is true that Allstate's first two motions for summary judgment, which were denied, raised the issue of whether Milton's actions were an "accident," this argument was also raised in the

---

[10]We do not hold, however, that every violation of a Washington criminal statute will constitute a "criminal" act releasing an insurer from liability for an insured's act or omission. As noted in *Peasley,* 131 Wn.2d at 434-36 (Madsen, J., concurring), some violations of criminal statutes would certainly not be contemplated by the average purchaser of insurance as precluding coverage under a "criminal acts" exclusion in a homeowners policy. But Milton's actions here were so extreme as to constitute clearly excluded "criminal acts" in the minds of an average purchaser of insurance.

third motion, in which summary judgment was granted to Allstate with regard to Milton. The trial court granted summary judgment based on *Peasley*, 131 Wn.2d 420, after considering Allstate's memorandum in support of its motion for summary judgment, which included Allstate's argument about lack of an "accident." Consequently, this argument is properly before this court.

■ Under the Kings' homeowners policy, "Allstate will pay all sums arising from an accidental loss which an insured person becomes legally obligated to pay as damages because of bodily injury or property damage covered by this part of the policy." "An accident is never present when a deliberate act is performed unless some additional unexpected, independent, and unforeseen happening occurs which produces or brings about the result of injury or death." *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 96, 776 P.2d 123 (1989). Such are not the facts here. Regardless of any mental instability Milton may have been suffering, he clearly engaged in deliberate acts when, after being told by his wife to come back into their house, he shot his neighbors in their own yard, chased them into their home, and continued firing. Raynor cannot reasonably claim that the manner in which the neighbors were harmed was unexpected, independent, and unforeseen where Milton next turned the gun on himself, pulled the trigger, and fired a fatal shot. Because Milton was not criminally insane, he is presumed to have intended his acts.[11] *Doty*, 58 Wn. App. at 551. Consequently, this shooting was no accident, and the Kings' homeowners policy provides no coverage for Milton's actions.

## IV. JOINT OBLIGATIONS CLAUSE
### A. Operation of the clause

■■ Allstate argues that the policy's "joint obligations"

---

[11]Moreover, "whether an event is an accident does not depend on the view of the insured." *Butler*, 118 Wn.2d at 403 (no "accident," and thus no coverage, where insured fired a gun into a metal truck, because no reasonable person could conclude that the risk of a ricocheting bullet hitting someone inside the truck was unforeseeable).

clause precludes coverage for Margie's acts, even negligent acts, because Milton's actions are binding on her; thus, Allstate properly denied coverage. We agree.

The joint obligations clause provides:

> The terms of this policy impose joint obligations on the person named on the declarations page as the Insured and that person's resident spouse. These persons are defined as *you* or *your*. This means that the responsibilities, acts and failures to act of a person defined as *you* or *your* will be binding upon another person defined as *you* or *your*.

This language presents an issue of first impression for Washington courts. Other courts have found these exclusions valid, permitting the excluded acts of one insured to absolve the insurer of liability for claims against any insured under the policy. *See Allstate Ins. Co. v. Steele*, 74 F.3d 878, 881 (8th Cir. 1996); *Castro v. Allstate Ins. Co.*, 855 F. Supp. 1152, 1155 (S.D. Cal. 1994). In the reported cases upholding "joint obligations" clauses, the acts of "an insured" had already been determined to be excluded under the policy. For example, in *Castro* and *Steele*, it was essentially undisputed that "an insured" committed intentional acts, leaving no question of fact. Similarly, here, we have held that Milton's intentional, criminal acts are excluded from liability coverage under the Kings' policy. Accordingly, we hold that the "joint obligations" clause should likewise apply.

Washington courts have interpreted an exclusionary clause based upon the acts of "an insured" as precluding coverage for an innocent insured where coverage for the acts of another culpable insured is excluded under the policy. *Farmers Ins. Co. v. Hembree*, 54 Wn. App. 195, 200-03, 773 P.2d 105 (1989); *Farmers Ins. Co. v. Edie*, 52 Wn. App. 411, 412, 763 P.2d 454 (1988). Such language has the same practical effect as a "joint obligations" clause. Consequently, coverage here for Margie is precluded because, as a matter of law, Milton's acts were "intentional"

and "criminal," and therefore excluded from coverage. The trial court properly decided this issue on summary judgment.[12]

## B. Public Policy

Raynor urges us to find that the policy language precluding coverage to Margie for Milton's acts violates public policy and is therefore void. Although we have not previously addressed this issue, Division One has decided that language having a similar effect does not violate public policy. *Hembree*, 54 Wn. App. at 204. We agree.

 Public policy is generally determined by the Legislature and established through statutory provisions. *American Home Assurance Co. v. Cohen*, 124 Wn.2d 865, 875, 881 P.2d 1001 (1994). Washington courts will not enforce limitations in insurance contracts that are contrary to public policy and statute, but insurers are otherwise free to limit their contractual liability. *State Farm Gen. Ins. Co. v. Emerson*, 102 Wn.2d 477, 481, 687 P.2d 1139 (1984). Although the Washington Supreme Court has occasionally questioned the wisdom of certain exclusionary clauses, "it has rarely invoked public policy to limit or void express terms in an insurance contract even when those terms seem unnecessary or harsh in their effect." *Cary v. Allstate Ins. Co.*, 130 Wn.2d 335, 340, 922 P.2d 1335 (1996) (footnotes omitted).

In general, the Washington Supreme Court has determined that

> exclusion clauses in insurance contracts are contrary to public policy in only two areas: (1) the FRA [financial responsibility act], RCW 46.29, and (2) the underinsured motorist (UIM), statute RCW 48.22.030. In both contexts, this court has found a strong legislative expression of public policy favoring

---

[12]We need not address Raynor's argument that Margie's actions were the efficient proximate of the deaths of Candy and Cheryl because the joint obligations clause would preclude Allstate's liability even if a jury were to find Margie's actions to have been a proximate cause of the deaths.

compensation for innocent victims of automobile accidents. However, we have not extended our holdings in FRA and UIM cases to other areas. For example, in *State Farm [Gen.] Ins. Co. v. Emerson* we determined a family exclusion clause in a homeowners' liability insurance contract was not void as against public policy. . . .

This court will not invoke public policy to override an otherwise proper insurance contract in the absence of an expression of public policy from either the Legislature or a prior court decision.

*Cary*, 130 Wn.2d at 344-45 (footnotes omitted). Because "[p]etitioner has presented no evidence or authority indicating a public policy against exclusion clauses in homeowners' insurance contracts which deny liability for criminal acts committed by an insured while insane," the *Cary* court upheld such an exclusion. 130 Wn.2d at 348-49. We apply a similar analysis here, and arrive at the same result.

██ ██ It is true, as Raynor here argues, that policy provisions denying coverage to Margie based upon Milton's independent acts leave her separate property interest unprotected under the Kings' homeowners policy. But this exclusion is clearly stated in the insurance policy for which the Kings contracted with Allstate. It is for the Legislature to declare whether such exclusions are violative of public policy, and then, for insurers and their insureds to renegotiate their policy coverage accordingly.

## CONCLUSION

We hold as a matter of law that Milton's acts in shooting his neighbors and causing Raynor's losses were clearly not "accidents," but rather "intentional" and "criminal" acts, excluded from liability coverage under the Kings' homeowners policy. We also hold that the policy's joint obligations clause excluded coverage for Margie's liability exposure arising from her own intentional acts and the intentional acts of her husband, Milton. We therefore affirm the trial court's grant of summary judgment to Allstate.

HOUGHTON, C.J., and SEINFELD, J., concur.

Review granted at 139 Wn.2d 1001 (1999).